UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------------------------------------------ x
ANTHONY T. COLLYMORE,                              :
                                                   :
                         Plaintiff,                :
                                                   :
            v.                                     :        3:21-CV-303 (SFR)
                                                   :
COMMISSIONER OF D.O.C., et al.,                    :
                                                   :
                         Defendants.               :
------------------------------------------------------------------ x
```

**MEMORANDUM AND ORDER**

Plaintiff Anthony T. Collymore, who is serving a sentence in the custody of the Connecticut Department of Correction ("DOC"),[1] filed a Second Amended Complaint ("SAC") under 42 U.S.C. § 1983, claiming that former and current DOC officials and employees acted with deliberate indifference to his scalp condition in violation of the Eighth Amendment to the U.S. Constitution. *See* SAC, ECF No. 45. Upon initial review of the SAC, the Court[2] permitted Collymore's Eighth Amendment deliberate indifference claims to proceed against Defendants DOC Commissioner Rollin Cook, Advanced Practice Registered Nurse ("APRN") Chena McPherson, APRN Mallory Muzykoski, Warden Robert Martin, former Correctional Managed Health Care Health Services Administrator Rikel Lightner

---

[1] I may "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). The Connecticut DOC website reflects that Collymore is currently housed at MacDougall Walker Correctional Institution in the custody of the Connecticut DOC. *See* https://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=336848 (last visited March 31, 2026).

[2] The Honorable Alfred V. Covello presided over this action until July 18, 2023, when the case was transferred to the Honorable Sarala V. Nagala. *See* Transfer Order, ECF No. 40. This case was transferred to me on January 6, 2025. *See* Transfer Order, ECF No. 135.

1

("HSA Lightner"), Registered Nurse and former Health Services Review Coordinator Janine Brennan ("HSRC Brennan"), Nurse Krystal Myers, Nursing Supervisor Kara J. Phillips, Correctional Officer Peter J. Murphy ("CO Murphy"), and Dr. Rader (collectively, "Defendants"), in their individual and official capacities.[3] SAC Initial Review Order ("IRO"), ECF No. 49; s*ee also* Order, ECF No. 50. Collymore's official capacity claim against APRN Muzykoski was subsequently dismissed. *See* Order, ECF No. 126.

Defendants APRN McPherson and APRN Muzykoski (collectively, the "APRN Defendants") have moved for summary judgment on the grounds that they were not deliberately indifferent to Collymore's medical needs. *See* ECF No. 140. Defendants Commissioner Cook, Warden Martin, HSA Lightner, HSRC Brennan, Nurse Myers, Nurse Supervisor Phillips, CO Murphy, and Dr. Rader (collectively, the "DOC Officials and Medical Defendants") move for summary judgment on the grounds that Collymore has not exhausted his administrative remedies, or alternatively, that they were not deliberately indifferent to Collymore's medical needs. *See* ECF No. 142. Collymore has conceded that summary judgment should be granted in favor of Commissioner Cook, CO Murphy, and HSA Lightner. *See* ECF No. 149, at 5.

For the reasons set forth below, I grant the APRN Defendants' motion for summary judgment, and I grant in part and deny in part the DOC Officials' and Medical Defendants' motion for summary judgment.

---

[3] The Initial Review Order of Collymore's SAC does not specify in what capacity Collymore's Complaint may proceed against Defendants. *See* SAC IRO, ECF. No. 49. However, I can reasonably discern that upon initial review of the SAC, Collymore's SAC proceeded against Defendants in both their individual and official capacities because the Court's subsequent order directed the Clerk to send official capacity service packets to Defendants. *See* Order, ECF No. 50.

## I.    BACKGROUND

### A.    Factual Background

The following factual background is taken from the APRN Defendants' Local Rule 56(a)(1) Statement ("APRN L.R. St."), ECF No. 140-2, and the DOC Official and Medical Defendants' Local Rule 56(a)(1) Statement ("DOC L.R. St."), ECF No. 142-2, as well as Collymore's Local Rule 56(a)2 Statements ("Pl.'s L.R. St."),[4] ECF No. 148, at 6-42, 49-60, and the underlying evidentiary record.[5] Because Collymore has conceded that summary judgment should be granted in favor of Commissioner Cook, CO Murphy, and HSA Lightner, *see* ECF No. 149, at 5, I will tailor my recitation of the facts to the occurrences concerning the APRN Defendants and Warden Martin, HSRC Brennan, Nurse Myers, Nursing Supervisor Phillips, and Dr. Rader.

---

[4] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides, in relevant part: "Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." It states that the "[f]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1[ ]." *Id.* Defendants have certified that they have provided Collymore with the Notice to *Pro Se Litigant* in compliance with Local Rule of Civil Procedure 56(b). *See* ECF Nos. 140-7, 142-14.

Generally, I cite only to the relevant paragraph in the Local Rule 56(a)1 Statement if the facts are not disputed. If the facts are disputed, I will primarily cite to one of Collymore's affidavits or the evidentiary record because Collymore always refers to one of his affidavits or the evidentiary record when disputing a fact. Collymore has submitted seven of his own affidavits, ECF No. 148 and one affidavit from another prisoner. *See* ECF No. 148.

[5] The page numbers cited to in this ruling regarding any documents that have been electronically filed refer to the page numbers imprinted by the electronic case filing system on the header of the documents and not to the page numbers of the original documents, if any, except for citations to excerpts from Collymore's deposition transcript.

Throughout the relevant time period, Collymore saw registered nurses (RNs), advanced practice registered nurse practitioners (APRNs), and doctors at the prisons where he was housed. Defendants assert that RNs "do not have the ability to diagnose conditions, prescribe medications, or overrule the care decisions of medical providers like doctors or APRNs." DOC L.R. St. ¶ 20 (describing the authority of Myers, an RN).[6] Although RNs cannot directly refer patients to specialists or medical providers who work outside DOC, they can refer a patient to an on-site APRN or doctor who can then refer a patient to an outside specialist or medical provider. *Id.* ¶¶ 21-22.

### a.      MacDougall Walker Correctional Institution

Collymore was housed at MacDougall CI from 2014 through 2019. SAC ¶ 34. In February 2015, Collymore's scalp became infected, with bumps and open pustules that bled, oozed puss, itched and burned. *Id.* ¶ 35. The medical records provided to the Court show complaints and treatment relating to Collymore's scalp dating back to 2017. Pl.'s Med. Rec., ECF No. 143, at 1201.[7] Collymore asserts that beginning in early 2019, his scalp had severely deteriorated, and he was walking around with a mass of blisters, open sores, and scabs on his

---

[6] Defendants use the word "provider" to refer to an APRN or a doctor—not a registered nurse. DOC L.R. St. ¶¶ 20-23.

[7] The APRN Defendants have provided Collymore's partial medical records as Exhibit A in support of their Motion for Summary Judgment, *see* ECF No. 141-1, and these medical records are contained within the medical records submitted by the DOC Officials and Medical Defendants as Exhibit A in support of their Motion for Summary Judgment, *see* ECF No. 143. Thus, I will solely cite to the medical records provided by the DOC Officials and Medical Defendants. For dates prior to 2018, it appears that only select medical records have been provided.

head that leaked blood and pus. Pl.'s Aff., ECF No. 148, at 96-97 ¶ 5.[8] His scalp also constantly itched and burned, causing him pain that frequently kept him awake at night. *Id.*

The events surrounding Collymore's claims against APRN McPherson and Nurse Myers occurred while Collymore was housed at MacDougall CI.

### b.      APRN McPherson

APRN McPherson worked at MacDougall CI from January 2019 through April 2020, and she no longer works for the DOC. APRN L.R. 56(a)1 St. ¶ 3. On May 14, 2019, Collymore met with APRN McPherson for the first time for his scalp condition. *Id*. ¶¶ 6, 8. She assessed him as having seborrheic dermatitis.[9] Pl.'s Med. Rec., ECF No. 143, at 1095. Collymore asserts that his scalp at the time clearly had visible bumps, open sores, scabs, pus, and blood. Pl.'s Aff., ECF No. 148, at 97 ¶¶ 8-9. APRN McPherson prescribed Sebex, a medicated shampoo, and clobetasol propionate ointment.[10] APRN L.R. 56(a)1 St. ¶ 7.

Collymore says that he told APRN McPherson that he had previously been prescribed Sebex shampoo and it had not been effective in treating his condition. Pl.'s Aff., ECF No. 148,

---

[8] Because Collymore has submitted two 56(a)2 statements and a number of affidavits, all of which use separate, sequential paragraph numbering, I will cite to the electronic case filing system page number and paragraph number when referencing documents in ECF No. 148.

[9] The Mayo Clinic states that seborrheic dermatitis "is a common skin condition that mainly affects your scalp" and "causes scaly patches, inflamed skin and stubborn dandruff." Mayo Clinic, Seborrheic       dermatitis,       https://www.mayoclinic.org/diseases-conditions/seborrheic-dermatitis/symptoms-causes/syc-20352710. I may take judicial notices of medical definitions from the Mayo Clinic website. *United States v. Panos*, No. 18-CR-581 (KMK), 2026 WL 221245, at *10 n.11 (S.D.N.Y. Jan. 27, 2026) (taking judicial notice of relevant entries on the Mayo Clinic website) (collecting cases).

[10] The Mayo Clinic states: "Clobetasol topical is used to help relieve redness, itching, swelling, or other discomfort caused by certain skin conditions. . . . This medicine is a corticosteroid (cortisone-like   medicine   or   steroid)." Mayo Clinic, Clobetasol (topical   application   route), https://www.mayoclinic.org/drugs-supplements/clobetasol-topical-application-route/description/drg-20073860.

at 97 ¶ 11. He also states that DOC medical records clearly recorded the continuing use of Sebex shampoo and other medications to treat his scalp for the past five and a half years but his "condition continued unabated," and thus it was obvious that Sebex shampoo was not effective in treating his condition. *Id*. at 98 ¶¶ 14-15.[11]

On May 21, 2019, Collymore saw APRN McPherson for a follow-up appointment after she had sent him to the emergency room for acute chest pain. APRN L.R. 56(a)1 St. ¶ 10. McPherson says that Collymore's scalp condition was not addressed at this visit, nor did Collymore request any changes to the course of the treatment she had prescribed for the condition. *Id.* ¶ 12. Collymore states that he told McPherson that his scalp had gotten worse, and that he asked her to look at his scalp and refer him to an outside doctor or specialist, but she refused and told him that he had to choose between treatment for his scalp or treatment for his hypertension problems during the visit. Pl.'s Aff., ECF No. 148, at 99 ¶ 17.

Next, on August 14, 2019, Collymore saw McPherson with complaints of blurred vision, headaches, and muscle spasms in the chest and thigh area, and Collymore advised McPherson that his scalp condition had not improved under the treatment plan she had prescribed on May 14, 2019. APRN L.R. 56(a)(1) St. ¶¶ 14-15. McPherson discontinued the clobetasol and Sebex shampoo she had previously prescribed, and instead prescribed

---

[11] Collymore's medical records confirm previous prescriptions for Sebex dating back at least to 2017. *See, e.g.*, ECF No. 143, at 1201.

ketoconazole 2% shampoo and triamcinolone 0.05% cream.[12] *Id*. ¶ 16.[13] McPherson documented a diagnosis of tinea capitis[14] in Collymore's medical records. ECF No. 143, at 961-62. Collymore says that McPherson refused his request at that time to see an outside doctor or specialist. Pl.'s Aff., ECF No. 148, at 99 ¶ 19.

### c.    Nurse Myers

Nurse Myers is a registered nurse who saw Collymore three times in 2019. DOC L.R. 56(a)1 St. ¶¶ 19, 27. On October 13, 2019, Myers saw Collymore in the housing unit. She wrote in his medical records that Collymore described his scalp as slightly itchy and she observed Collymore's scalp to be slightly red. Pl.'s Med. Rec., ECF No. 143, at 926. Collymore states that he told Myers about the pain he was experiencing from his scalp condition, and he showed her his scalp with open sores, blood, and pus. Pl.'s Aff., ECF No. 148, at 69 ¶ 7. Collymore asserts that he asked Myers to see a doctor. *Id.* Myers says that Collymore asked her to refill his medications, triamcinolone and ketoconazole shampoo. Myers Decl. ECF No. 142-10 ¶ 8. Although Collymore says that he did not ask Myers to refill

---

[12] The Mayo Clinic states: "Ketoconazole is used to treat infections caused by a fungus or yeast. It works by killing the fungus or yeast or preventing its growth." Mayo Clinic, Ketoconazole (topical route), https://www.mayoclinic.org/drugs-supplements/ketoconazole-topical-route/description/drg-20067739.

"Triamcinolone topical is used to help relieve redness, itching, swelling, or other discomfort caused by skin conditions. This medicine is a corticosteroid (cortisone-like medicine or steroid)." Mayo Clinic, Triamcinolone (topical application route), https://www.mayoclinic.org/drugs-supplements/triamcinolone-topical-application-route/description/drg-20073937.

[13] As reflected in Collymore's medical records, the last mention of APRN McPherson is on January 24, 2021, when she authorized bloodwork for Collymore. Pl.'s Med. Rec., ECF No. 143, at 729-40.

[14] The Mayo Clinic says: "Ringworm of the scalp (tinea capitis) is a rash caused by a fungal infection. It usually causes itchy, scaly, bald patches on the head." Mayo Clinic, Ringworm (scalp), https://www.mayoclinic.org/diseases-conditions/ringworm-scalp/symptoms-causes/syc-20354918.

his medication, Pl.'s Aff., ECF No. 148, at 69 ¶ 6, he agrees that Myers did in fact send a request to APRN McPherson to refill his medication, DOC L.R. 56(a)1 St. ¶ 30. It does not appear that Myers placed Collymore on the list to see an APRN or doctor at this time.

On November 13, 2019, Collymore saw Nurse Vilayvong, a registered nurse, who submitted a request to APRN McPherson for a "provider sick call" for Collymore. Vilayvong stated: "[N]eeds further assessment after failing treatment of creams to scalp and face. Development of rash to face, scalp and ears." Pl.'s Med. Rec., ECF No. 143, at 922. It does not appear that APRN McPherson responded to that request.

On November 20, 2019, Nurse Myers saw Collymore for the second time. DOC L.R. 56(a)1 St. ¶ 30. Again, the encounter was in the housing unit. Pl.'s Med. Rec., ECF No. 143, at 918-920. In Collymore's medical records, Myers documented, "dry scalp, some scabs noted, scalp red and irritated," and "rash has cleared up since stopping the shampoo but would like another option for dry scalp." *Id.* at 918-20. She noted he rated his pain as 5, indicating "Moderate/Severe Pain." *Id.* at 918. Myers also noted that Collymore was already on the list to be seen by a medical provider, and she suggested that Collymore try dandruff shampoo sold at commissary while he waited to see the provider. *Id.* at 919. Collymore says that Myers' notes in his medical records are false because he showed her his scalp, which had open sores, scabs, bumps, blood, and pus. Pl.'s Aff., ECF No. 148, at 70 ¶ 9. Collymore asserts that he asked Nurse Myers to see a doctor. *Id.*

On the morning of December 8, 2019, Collymore says Myers was in his housing unit. Pl.'s Aff., ECF No. 148, at 138 ¶ 8. A correctional officer asked Myers to see Collymore but she left without seeing him, saying she had other things to do. *Id.* ¶¶ 9-10. The officer then sent Collymore up to the medical unit, where he saw Nurse Myers for the third and final time.

*Id.* ¶¶ 13-14; DOC L.R. 56(a)1 St. ¶ 36. Myers documented in Collymore's medical records his complaint that his "head is burning and on fire." Pl.'s Med. Rec., ECF No. 143, at 912. She wrote that he described his pain at a level 10, meaning "Worst Pain Possible." *Id.* at 911.

In her Declaration, Myers asserts that she arranged for Collymore to see the medical provider on duty that day. Myers Decl. ¶¶ 10-11, ECF No. 142-10. Collymore states that Nurse Myers told him that he could not see the doctor immediately, but that she would make sure he would see the doctor soon. Pl.'s Aff., ECF No. 148, at 139 ¶ 14. Collymore says he became emotional and refused to leave, loudly stating he would go to segregation before he left without care. *Id.* ¶ 15. Collymore says several nurses rushed into the room. *Id.* ¶¶ 15-16. Collymore told them that he was not trying to be disrespectful but he could not take the pain anymore. *Id.* ¶ 18. Myers told the nurses that Collymore was complaining about his scalp and wanting to see a doctor, and then one of the nurses left the room and returned with APRN Stork, who looked at Collymore's scalp and said, "[i]t's infected." *Id.* ¶¶ 17-19. Myers documented in Collymore's medical records that Collymore saw the "star of the day," which she explains in her affidavit means the medical provider (APRN or doctor) who was on duty that day. Myers Aff., ECF No. 142-10 ¶ 10.

APRN Stork, who has not been named as a defendant in this action, prescribed Collymore an antibiotic, Bactrim, to take two tablets a day, twice a day, for fourteen days, DOC L.R. 56(a)1 St. ¶¶ 39-40; Pl.'s Med. Rec., ECF No. 143, at 912. Collymore says APRN Stork diagnosed Collymore with a scalp infection. Pl.'s Aff., ECF No. 148, at 100 ¶ 21. At Collymore's deposition, he testified that Myers gave him approximately forty tablets of the Bactrim antibiotics that same day, *see* Pl.'s Dep., ECF No. 142-5, at 243:4-244:14, but not the full prescription, *id*. at 63:21-63:3. It was typical at that time to provide patients with a portion

of the medication they were prescribed from a stock medication supply and then for patients to receive the rest of their medication in the medication line during second shift. DOC L.R. 56(a)1 St., ECF No. 142-2 ¶ 43. Collymore testified that he did "get a little relief" from the antibiotics. *See* Pl.'s Dep., ECF No. 142-5, at 63:18-64:10.

### 2. Corrigan Correctional Center

On December 12, 2019, Collymore was transferred to Corrigan Correctional Center ("Corrigan CC"). SAC ¶ 116. The events surrounding Collymore's claims against APRN Muzykoski, Warden Martin, HSRC Brennan, Nurse Supervisor Phillips, and Dr. Rader occurred while Collymore was housed at Corrigan CC.

### a. Defendant Muzykoski

APRN Muzykoski worked at Corrigan CC from December 2019 through June 2020, and she no longer works for the DOC. APRN L.R. 56(a)1 St.¶ 21.

On December 16, 2019, Muzykoski saw Collymore for the first time. *Id*. ¶ 24. She documented that Collymore had recently transferred from MacDougall CI where he had been treated with two antifungal creams, that he was "placed on Bactrim 2 tabs twice a day for 14 days, which he state[d] had helped some but still not improved," and that Collymore had told her that he was about to run out of his Bactrim medication. Pl.'s Med. Rec., ECF No. 143, at 908.

When Collymore saw Muzykoski on December 16, 2019, his scalp condition was causing blood and pus to leak from opens sores. Pl.'s Aff., ECF No. 148, at 100 ¶ 23. Collymore explained to Muzykoski that he had been placed on Bactrim and his scalp condition had improved slightly, but the condition had not entirely resolved. APRN L.R. 56(a)1 St. ¶ 26. Muzykoski observed "scattered erythema, scabs, excoriation through out scalp, dis[]coloration

on forehead." Pl.'s Med. Rec., ECF No. 143, at 908. Muzykoski ordered one more week of Bactrim DS, and instructed Collymore to go to the medication line if he had not received the Bactrim by Wednesday (two days later). *Id.* She also ordered lotrisone cream and told Collymore he should call medical in one week if there was no improvement. *Id.* Collymore testified at his deposition that Muzykoski provided the antibiotics he requested, which provided some relief for his scalp. APRN L.R. 56(a)1 St. ¶ 32.

On January 13, 2020, Collymore saw Muzykoski for the second and last time about his scalp. *Id.* ¶ 29. She documented that Collymore "was being treated for contact cellulitis with Bactrim for 14 days," and that he had reported that his rash had gotten better but then started to come back and was now painful and itchy. Pl.'s Med. Rec., ECF No. 143, at 895. Muzykoski observed "scattered erythema, scabs, excoriation through out scalp." *Id.* She wrote in her notes "dermatitis unknown or[i]gin" and "dermatology referral." *Id.* She prescribed Bactrim for another fourteen days. *Id.* In addition, she ordered bloodwork to test Collymore's immune markers, and on January 24, 2020, she noted that Collymore's test results revealed his autoimmune markers were normal. DOC L.R. 56(a)1 St. ¶ 87. Collymore states that when he saw Muzykoski on January 13, 2020, his scalp condition was causing blood and pus to leak from open sores, and he had scabs, bumps, and pustules on his head. Pl.'s Aff., ECF No. 148, at 100 ¶ 25.

In her affidavit, Muzykoski confirms that she "referred Mr. Collymore to a dermatologist" and "[o]nce an inmate is referred to a provider outside the Department of Corrections, the outside provider controls when the appointment occurs." Muzykoski Aff., ECF No. 141-3 ¶ 6,. Although Muzykoski wrote "dermatology referral" in her notes from the visit on January 13, 2020, there is no documentation in the medical records showing how and

11

when Muzykoski submitted that referral. It is also not clear from the current record how others within DOC could see the status of that referral.

### b.        Warden Martin

On March 20, 2020, Collymore wrote an Inmate Request to Warden Martin stating that he had had an ongoing scalp infection for quite some time and had been seen by medical multiple times, but he still had not been properly diagnosed or treated, and he needed to see a doctor. DOC L.R. 56(a)(1) St. ¶¶ 55-56. Collymore also wrote that his scalp was on fire and itching and the problem was now spreading to his face, and he requested that Martin investigate the matter. Pl.'s Inmate Requests ("IR"), ECF No. 1-1, at 12-13.[15]

Martin checked with Corrigan CC's medical staff, and he was informed that Collymore had been and was being treated with medications, including medicated shampoo.[16] DOC L.R. 56(a)(1) St. ¶ 55-57. Medical staff also informed Martin that Collymore had already been referred for an appointment with a dermatology specialist at UConn medical center.[17] *Id*. ¶¶

---

[15] My review of the record includes review of inmate requests attached to the original verified Complaint. *See Jordan v. LaFrance*, No. 3:18-cv-1541 (MPS), 2019 WL 5064692, at *1 n.1 (D. Conn. Oct. 9, 2019) (noting that a verified complaint may be considered as an affidavit for summary judgment purposes); *Walcott v. Connaughton*, No. 3:17-cv-1150 (JCH), 2018 WL 6624195, at *1 n.1 (D. Conn. Dec. 18, 2018) (same). Here, I consider these documents because they are verified by the Complaint, and Collymore is representing himself *pro se*. Moreover, even if I did not consider these documents, I would nonetheless come to the same conclusion based on the other evidence in the record.

[16] Collymore states that he has no knowledge which would allow him to admit or deny this statement. Pl.'s L.R. 56(a)(2) St. ¶ 56, ECF No. 148, at 18. Where Collymore responds to a statement of fact by stating he has no knowledge to admit or deny the statement, I will find that statement admitted. *See Walton v. Connecticut*, No. 3:03CV2262, 2006 WL 533793, at *2 n.3 (D. Conn. March 2, 2006) (deeming admitted material facts set forth by the defendant where the plaintiff merely claimed insufficient knowledge to respond and offered no evidence to dispute the facts).

[17] Collymore states that he has no knowledge which would allow him to admit or deny this statement. Pl.'s L.R. 56(a)(2) St. I thus deem the fact admitted.

57, 67. On March 23, 2020, Martin responded to Collymore's Inmate Request and stated, "I have been informed by medical that you have been referred to dermatology, but due to COVID-19, all non-urgent appointments are being postponed." Correspondence, ECF No. 1-1, at 14.

Martin regularly toured the housing units at Corrigan, saw Collymore during tours of the housing units and would speak with him, but says that he never examined Collymore's scalp. DOC L.R. 56(a)(1) St. ¶¶ 63-64. Collymore states that he showed Martin his scalp on more than one occasion, and Martin had the opportunity to observe Collymore's open sores and scabs. Pl.'s Aff., ECF No. 148, at 73 ¶ 22.

Collymore has submitted an affidavit from Troy Jackson, who was housed in the same block with Collymore for most of 2020, and became Collymore's cellmate in mid to late 2020. Jackson Aff., ECF No. 148, at 107 ¶¶ 1-3. Jackson attests that on several occasions, Collymore complained to him that his scalp was hurting and infected and DOC medical was refusing to do anything about it. *Id*. ¶ 4. Jackson also knew that Collymore had filed multiple Health Service Review ("HSR") requests concerning his scalp because Collymore would read the HSR requests to Jackson before submitting them, and Jackson watched as the HSR requests were "denied, ignored, and rejected unjustly." *Id*. ¶ 5. Jackson saw bumps, bleeding, puss, and sores on Collymore's scalp. *Id*. at 108 ¶ 6. On several occasions, Jackson witnessed "Collymore speaking to the Warden, complaining about his scalp, and asking the Warden to do something," as well as requesting to see a doctor. *Id*. ¶ 7.

### c.    Nursing Supervisor Phillips and HSRC Brennan

Nursing Supervisor Phillips is a nursing supervisor at Corrigan CC and Brooklyn Correctional Institution, and she has worked as a nursing supervisor since 2017. Phillips Decl., ECF No. 142-11 ¶ 5. Phillips is trained as a registered nurse. Her job duties, which she

13

describes as "administrative in nature," include "payroll, making the nurses schedule, ordering supplies, auditing the pharmacy, touring the facilities, and supervising the nursing staff" but "not providing direct patient care." *Id.* ¶ 6. However, she occasionally takes overtime shifts and provides direct care. *Id.* ¶ 7. She says: "I do not have the authority to order or dictate to doctors or APRNs what medical decisions to make or what medical care to provide inmates." *Id.* ¶ 9. She also says she has no "control over scheduling specialty visits with UCONN or any outside medical provider." *Id.* ¶ 10.

On February 21, 2020, approximately one month before Collymore sent his Inmate Request to Warden Martin, he sent an Inmate Request to medical stating: "I am asking that I be fast tracked, to see a doctor." Pl.' Med. Rec., ECF No. 143, at 879.[18] He explained that he had seen the "nurse and provider on multiple occasions" concerning his scalp, had taken numerous medications that had failed to cure his condition, and the condition was "getting wors[e]" and had spread to his face. *Id.* He stressed: "This has been going on for more than a year and I haven't seen a doctor yet." *Id.* Phillips responded on February 23, 2020, stating, "You have a referral for dermatology placed." *Id*. It does not appear that Phillips took any step to ensure that Collymore saw a doctor or APRN at the facility.

HSRC Brennan served as the Health Services Review Coordinator for Corrigan CC from April 2015 until December 2023. DOC L.R. 56(a)(1) St. ¶¶ 120, 123-24. She is trained as a registered nurse. Brennan Decl. , ECF No. 142-7 ¶ 4. In her role as HSRC, she was responsible for tracking and responding to inmate complaints submitted through the Health

---

[18] Inmate Request forms are scanned into the electronic medical records of prisoners after they are submitted. *See, e.g.*, Pl.' Med. Rec., ECF No. 143, at 878.

Services Administrative Remedies process set forth in Administrative Directive 8.9. *Id.* ¶¶ 4, 9-10. She says she did not provide direct patient care, did not have authority to overrule medical decisions of doctors, APRNs, and medical administrators, and had "no control over scheduling specialty visits with UCONN such as with dermatology." *Id.* ¶¶ 4, 6, 8.

On March 1, 2020, Collymore submitted his first Health Services Review ("HSR") request to Brennan, asking to "be seen by outside doctors for diagnoses [and] treatment for an ongoing medical condition [he had] been dealing with for a long period of time." Pl.'s HSR & IR, ECF No. 142-8, at 4. Collymore also wrote that his scalp was infected with open sores and red bumps that leaked, his scalp burned and itched, and more recently the condition had spread to his face "leaving an outbreak of bumps, a rash that is swollen [and] redness." *Id*. Collymore also stated:

> I've wrote to medical and been seen by medical many times for this problem and given multiple medications too. Only to have matters wors[en] and the symptoms to persist. The last solution by medical was to put in a referral for dermatology. . . . The in-house nurses [and] providers[19] have done for me what they could, within their job description, they cannot diagnose or treat my condition. I need to be seen by an outside physician/doctor. In the meantime, my condition continues to worsen and has become unbearable.

*Id*. In Collymore's HSR request, he checked the box for "Diagnosis/Treatment." *Id*. at 5.

On March 18, 2020, Collymore submitted another Inmate Request to "medical supervisor" stating that his "scalp [was] constantly on fire, itching, and open sores [were] spread throughout." Pl.'s Med. Rec., ECF No. 143, at 877. He explained: "I'm in need of medical attention, from a doctor to properly diagnose my condition [and] treat it." *Id.* He also

---

[19] During Collymore's deposition, he confirmed that "the in-house nurses [and] providers" included APRN McPherson and APRN Muzykoski, but he stated that he used a poor choice of words. Pl.'s Dep., ECF No. 141-2, at 235:1-241:9.

noted that he had submitted a medical grievance on March 1, 2020 regarding the condition. *Id.* Nursing Supervisor Phillips responded on March 20, 2020, stating that Collymore would have an appointment with dermatology, and that he should write to "nurse sick call" if he needed to be seen sooner. *Id.* It does not appear that Phillips put Collymore on the list to see a doctor or APRN at the facility after receiving this Inmate Request.

On the same day, HSRC Brennan returned Collymore's first HSR request "Without Disposition." Pl.'s HSR & IR, ECF No. 142-8, at 6. Brennan noted that Collymore had checked the box for "diagnosis/treatment." *Id.* She stated that this would indicate that an inmate "saw a provider (MD or APRN) and disagree[d] with their 'diagnosis and or treatment,'" but Collymore's HSR request did not qualify under "diagnosis and/or treatment." *See id.* She also wrote that a referral to dermatology had already been started and stated further: "If the HSR was written due to the 'wait time' to see an outside doctor, please note that wait time for outside appointments fall out of the purview of HSR. I cannot make your appointment happen any faster." *Id.*[20]

On August 4, 2020, Collymore submitted a second HSR request to Brennan, stating that for the past few years he had been dealing with his medical condition or disease for his scalp, he "wrote countless times seeking proper diagnoses and treatment" that had not yet

---

[20] Collymore wrote an Inmate Request on July 11, 2020 asking to be seen ASAP and complaining about his "intolerable" scalp condition. Pl.'s Med. Rec. 143, at 830. He was seen by an RN on July 18, 2020, who noted "Pustules/Lesions" and "tiny white bumps with some flaking." *Id.* at 826. The RN did not refer Collymore to an APRN or doctor. On July 26, 2020, Collymore submitted an Inmate Request asking for a bottle of Sebex shampoo, stating his scalp was "doing bad, it's inflamed and red." *Id.* at 821. An order for the bottle was generated on July 28, 2020. *Id.* at 823. Collymore was seen again by an RN on August 1, 2020 who observed that Collymore appeared to have bumps approximate 2 cm and round. *Id.* at 813. The RN did not refer Collymore to an APRN or doctor.

happened, he had filed unsuccessful HSR requests, and he had consistently been denied adequate medical care for a serious medical need. Pl.'s HSR & IR, ECF No. 142-8, at 1.[21] Collymore checked the box for "Diagnosis/Treatment." *Id*. at 2. HSRC Brennan returned Collymore's second HSR Request "Without Disposition" because Collymore had not stated which provider he saw on which date that he disagreed with, and he had not attempted informal resolution first. *Id*. at 3. She also stated that the "grievance process is not for monetary gain." *Id.*

On September 10, 2020, Collymore submitted another Inmate Request to medical stating that he had been denied adequate medical care for five years, that he was continuing to suffer, that his scalp had been infected at least twice, and that the condition had wreaked havoc on his scalp. Pl.'s Med. Rec., ECF No. 143, at 791-92. He requested that the matter be treated as urgent and that he "receive immediate diagnoses [and] treatment (Hospital)." *Id*. The next day, Nursing Supervisor Phillips responded stating: "You are on the list to see dermatology." *Id*. at 791; Phillips Decl., ECF No. 142-11 ¶ 17. Again, it does not appear that Phillips put Collymore on a list to be seen by a doctor or APRN at the facility.

On September 15, 2020, Collymore submitted a third HSR Request to HSRC Brennan, stating that he had been denied adequate medical care in violation of the U.S. Constitution, he had written "too many requests to count seeking informal resolution," and that he had been asking DOC/medical to diagnose and treat his scalp condition for five years and it still hadn't happened. Pl.'s HSAR & IR, ECF No. 142-8, at 12. He also noted that he was continuously

---

[21] On the HSR request, Collymore says "Continued: Please see attached" but there does not appear to be an attached page provided. Pl.'s HSR & IR, ECF No. 142-8, at 1.

suffering, and his scalp had been infected at least twice and now the damage was permanent. *Id.* Collymore asked for the matter to be treated as "URGENT" and asked to be brought to UConn. *Id.* at 11. Collymore checked the box for "Diagnosis/Treatment." *Id*. at 13. On October 19, 2020, Brennan wrote "Rejected" on Collymore's HSR request, stating: "URC is not within the power of HSR. This is a wait time issue, not 'diagnosis/treatment.' HSR is not for monetary gain or any 'compensation.'" *Id*.

On October 15, 2020, Collymore submitted a fourth HSR request to Brennan in which he stated that he had been seeking treatment for his painful scalp condition and that he had written to the DOC Commissioner, wardens at two different facilities (MacDougall CI and Corrigan CC), medical supervisors of two different facilities, and other medical personnel pertaining to his scalp condition. *Id*. at 14. He further stated that his scalp condition was "very irritable," and at times it itched, bled, burned, and had puss with bumps that spread. *Id*. He stated: "For 5 years I've asked for the proper diagnosis [and] treatment, to no avail." *Id.*[22] This time Collymore check the box for "All Other Health Care Issues." *Id*. at 15. On November 9, 2020, Brennan returned Collymore's HSR request "Without Disposition," stating that HSR cannot make an outside appointment happen any faster, that Collymore had already been referred to a dermatologist, and that "HSR is not for financial gain." *Id*. at 16.

On November 12, 2020, Collymore attempted to appeal Brennan's decision returning his fourth HSR request "Without Disposition." Pl.'s Inmate Requests, ECF No. 1-1, at 2. Collymore explained that Brennan, "by returning my grievance without disposition, has denied

---

[22] On the HSR request, Collymore says "Continued: Please see attached" but there does not appear to be an attached page provided. Pl.'s HSR & IR, ECF No. 142-8, at 14.

me the right to grieve a medical matter in an attempt to seek immediate relief and exhaustion of the administrative remedies available." *Id.* Collymore said that returning his grievance "without disposition" was "in essence a denial of [his] grievance" without saying "denied." *Id.* at 3. He asked for the decision to be reversed and his grievance to be disposed of on the merits, and that "any appropriate relief be granted." *Id.*

Collymore states that his November 12, 2020 appeal of Brennan's decision was "intercepted by Brennan and inappropriately answered by her, even though the appeal focused on her handling of the HSR process." SAC ¶ 150.[23] Under the heading "Reasons," in a section of the form titled "For official use only – Designated Facility Health Services Supervisor," the following is stated: "Cannot appeal 'Return without Disposition. Must correctly file level 1 first.'" IR, ECF No. 1-1, at 2. The statement is unsigned and undated. *Id.*

Collymore appealed that decision on November 21, 2020. *Id.* Collymore says Brennan "again intercepted the filing in an attempt to prevent Collymore's exhaustion of his administrative remedies." SAC ¶ 151. There is an updated and unsigned post-it note attached to the form that states: "Per AD 8.9 Cannot appeal RWD!" *Id.* The form has two date stamps on it: November 12, 2020 and November 24, 2020. *Id.*

On December 6, 2020, Collymore submitted an Inmate Request to Brennan that asked if his November 21, 2020 "Appeal of Health Services Review" had been received. Pl.'s Med. Rec., ECF No. 143, at 768. He asked: "If that grievance appeal isn't being processed, I ask that

---

[23] Here, I rely on Collymore's statements in his Second Amended Complaint, which are verified. *See Jordan*, 2019 WL 5064692, at *1 n.1 (D. Conn. Oct. 9, 2019).

it be returned as I would like to resubmit my original grievance for H.S.R., minus the two resolutions you said I couldn't ask for." *Id.*

Collymore says he spoke to Warden Martin about Brennan's mishandling of the HSR requests and Martin informed Collymore that "it was not his job" and that Collymore should write to the Chief Regional Operations Officer. SAC ¶ 152. Collymore said he did so and received no response. *Id.*

On December 6, 2020, Collymore submitted an Inmate Request to Lt. Peau[24] asking for assistance in filing grievances and exhausting his administrative remedies. Pl.'s IR, ECF No. 1-1, at 15. Collymore had previously spoken to Lt. Peau and had described his difficulties getting his medical grievances processed. Pl.'s Aff., ECF No. 148, at 111 ¶ 9.

A few days later, on December 8, 2020, Collymore submitted a fifth HSR request to HSRC Brennan, stating that he had been denied adequate healthcare, that he was attempting to exhaust his administrative remedies and to seek appropriate relief, and that for the past five years he complained to DOC medical concerning his scalp condition, which sometimes "itches, burns, puss, bleeds, with bumps that have spread, taking over a large portion of my scalp, leaving keloid scars, causing chronic pain and hair loss." Pl.'s HSAR & IR, ECF No. 142-8, at 8. Collymore explained: "I've been put on notice that 'I'm on the list for Dermatology.' Though being put on a list and prolonging diagnosis [and] treatment while my condition worsens, to me is insufficient. With this grievance I ask that the matter be looked into, that my situation be treated as URGENT, and whatever relief deemed appropriate." *Id.* at 10.

---

[24] Lt. Peau is not named as a defendant in this action.

Also on December 8, 2020, Brennan responded to Collymore's December 6, 2020 Inmate Request, which had inquired about the status of his appeal. Pl.'s Med. Rec., ECF No. 143, at 768. She wrote: "Cannot appeal 'Return Without Disposition.' RWD means you did not file level 1 correctly. Cannot appeal this. Must fix it and do level 1 correctly. According to my log, all have been RWD or rejected. There is nothing you can appeal." *Id.*

On December 21, 2020, Lt. Peau responded to Collymore's Inmate Request, writing, "I spoke to the medical grievance staff member about your requests. She stated to me that the last request you submitted was good. She also stated that moving forward that you have to wait for an appointment to see the specialist that you are requesting to see." Pl.'s IR, ECF No. 1-1, at 15. On the same day, HSRC Brennan marked "Rejected" on Collymore's December 6, 2020 HSR request, stating: "[A]s already explained in the previous HSRs, the HSR cannot make an outside appointment happen any faster. It is controlled outside the facility." Pl.'s HSR & IR, ECF No. 142-8, at 8.

On December 22, 2020, Collymore submitted another Inmate Request to medical, writing that he could not sleep all night because his scalp was inflamed and hurt, it was very uncomfortable, and he thought his scalp was on the verge of infection, so he requested to see an "in house physician" since he had been told he would have to wait to see an outside specialist. Pl.'s Med. Rec., ECF No. 143, at 764. He noted that this was the second request he had written to medical that month and the first had not been answered. *Id.* The previous request, dated November 30, 2020, stated he was suffering, the condition was painful, itchy, and spreading, and he was asking to be seen ASAP. *Id.* at 762.

On December 24, 2020, Nursing Supervisor Phillips responded to the Inmate Request by telling Collymore that he "was on the list to be seen." *Id.* Although Collymore had requested

21

to see an in-house doctor, Phillips put Collymore on the "nurse sick call list." *Id.* at 765-66; Phillips Decl., ECF No. 142-11 ¶ 18.[25]

On January 2, 2021, Collymore saw Nurse Fraser. She saw gave him Motrin for the pain and stated that he should see a medical provider (i.e., either an APRN or doctor) for further evaluation. Pl.'s Med. Rec., ECF No. 143, at 760; DOC L.R. 56(a)(1) St. ¶¶ 110-11. Fraser submitted a request "On Site Referral – Prescriber (Medical)." Pl.'s Med. Rec., ECF No. 143, at 756, 760.[26]

On April 13, 2021, Collymore wrote an Inmate Request to medical saying: "My scalp is infected: I need to see a doctor or nurse A.S.A.P. . . . Can I at least have some bacitration for the open soars on my scalp? My scalp is very dry too?" *Id.* at 629. Nurse Trickett responded by placing Collymore on the RN sick call list. *Id.* On April 17, 2021, Collymore saw Nurse Valentukonis, who placed Collymore on the "MDSC" (presumably the MD sick call list) for follow up. *Id.* at 626.

On May 4, 2021, Collymore submitted an Inmate Request to medical and stated that he had been experiencing spasms in the left eye, with blurry vision, and inquired as to whether

---

[25] On December 28, 2020, Nurse Fraser responded to Collymore's November 30, 2020's request stating: "You have been approved to be seen by dermatology but due to the pandemic, dermatology is not seeing any patients right now. We are [illegible] there for a video visit but whether or not that happens is not under our control. In the meantime, you are on the list to be seen." Pl.'s Med. Rec., ECF No. 143, at 762. The same day, Dr. Feder sent a message in the "Alert/Flags" to Nurse Barroga stating: "Can we arrange for a tele visit with dermatology? He really seems to have a terrible scalp issue, and we need direction." *Id.* at 1192. Barroga responded: "As far as I know derma is currently not seeing patients right now. I forwarded your message to Sam anyways." *Id.* It does not appear that Dr. Feder saw Collymore.

[26] On March 8, 2021, Collymore filed this lawsuit for deliberate indifference to his scalp condition against various DOC officials and employees. Compl., ECF No. 1. The Court issued a service order on May 25, 2021. ECF No. 14. A request for waiver of service was sent to Phillips on June 10, 2021 and signed on June 17, 2021. ECF No. 18.

the condition was related to his blood pressure or his scalp, which had been infected twice already. Pl.'s Med. Rec., ECF No. 143 at 612. He said: "I would like to be seen by a doctor A.S.A.P." *Id.* The next day, Nursing Supervisor Phillips responded that Collymore was on the list "to see the provider." *Id*. It does not appear Phillips took any action after receiving this request. By this time, Collymore apparently had been on "the list" to see an in-house doctor or APRN since Nurse Fraser's request four months earlier on January 2, 2021. It appears from Collymore's medical records that he had not seen a provider (APRN or doctor) with the ability to diagnose him or prescribe medication since he saw APRN Muzykoski on January 13, 2020.

On May 9, 2021, Collymore saw Nurse Trickett who noted in his medical records: "IM reports bumps open areas are painful and inter[r]upt sleep." *Id.* at 606. Trickett observed "Pustules/Lesions" that were "all over [scalp] within hair." *Id.* at 607. Her notes reflect that she sent "flags" to onsite providers for Collymore's longstanding problems regarding "skin lesions on scalp" and questioning "if IM has pending derm[a]tology app in community." *Id.* at 608. Trickett sent a message in the "Alert/Flags" to Nurse Barroga, Dr. Feder, and Dr. Rader that said: "IM believes he has a dermatology consult, Does this IM have a p[]ending dermatology appt??" *Id.* at 1193.

### 3.    Nursing Supervisor Phillips and Dr. Rader

On May 12, 2021, Collymore saw Dr. Rader the first time, and Rader diagnosed Collymore with a "scalp rash" and "possible infected seborrheic dermatitis." *Id*. at 601. In examining Collymore, Radar noted: "Some scattered areas of dried blood with occ small non-erupted pustule." *Id.* He prescribed Bactrim antibiotics for ten days and Lubriderm for moisturizing, and he wrote, "will send to Derm with URC for possible consult." *Id*. On the same day, in the "Alert/Flags" for Collymore, Rader wrote to Nurse Barroga and stated, "IM

23

Collymore. [T]here's a question as to if he has a derm consult, or was one ever put in for him? [H]e's had a 'long time' scalp condition that sounds like it was attempted to be addressed before he got to Corrigan." *Id.* at 1193. Barroga responded to Rader the same day, stating, "His dermatology is still active and still waiting for scheduling." *Id*.

On May 20, 2021, Collymore submitted an Inmate Request stating that when he saw Rader he was prescribed a lotion for dryness, which he had not yet received, and that he noticed a boil on his scalp. *Id*. at 592. He requested to see Rader.[27] *Id*.. On June 3, 2021, Collymore received a response from Rader stating, "As we discussed, get a conditioner from commissary. I will look into a shampoo for your conditioner." *Id*. Rader then saw Collymore that same day, and Rader documented, "Derm – noted dry, slightly flaking rash to scalp, stopping at the hair line. No open lesions, blisters, or pustules." *Id*. at 589. Rader diagnosed Collymore with "scalp dermatitis," and noted that the secondary infection had improved, and he would switch Collymore to "medicated shampoo." *Id*. Rader also wrote, "Had been on Sebex in the past, and stated some improvement, but was not happy to try again as yet. Will try Nizoral and see if any success. IM willing to try . . . . Will follow in 1-3 months." *Id*.

On June 9, 2021, Collymore submitted an Inmate Request to medical stating that when he saw Rader on June 3, 2021, Rader had informed him that he had been taken off the list for

---

[27] The allegations in Collymore's SAC against Nursing Supervisor Phillips end with Nursing Supervisor Phillips' response to Collymore's December 22, 2020 Inmate Request, *see* SAC ¶ 130, and the allegations in Collymore's SAC against Dr. Rader end with Collymore's visit with Dr. Rader on May 12, 2021, see *id*. ¶¶ 153-58. While the SAC is the operative pleading, which along with the SAC IRO, dictates the claims and the timeline surrounding those claims, I find that a description of events that occurred with Phillips after December 22, 2020, and the events that occurred with Rader after May 12, 2021, as described in Collymore's medical records, Pl.'s Med. Rec., ECF No. 143, and other evidence in the record are relevant to my assessment of Collymore's deliberate indifference claims. However, I find that I need not assess events past December 2021.

24

a dermatology referral. *Id*. at 582. Collymore explained he had waited for more than a year for the dermatology appointment and he should not have been taken off the list because "his condition has not been cured or properly treated." *Id.* On June 15, 2021, Nursing Supervisor Phillips responded, "Your initial dermatology consult was withdrawn because it was over 1 year old. Rader plans to put another consult into the system." *Id*.

On June 20, 2021, Collymore put in another Inmate Request asking to go to UConn or any hospital because he had been dealing with his scalp condition for quite some time, and he had just finished a prescription of antibiotics to combat another scalp infection, but he was in pain and sores were spreading throughout his scalp, with blood, puss, and scabs, and the shampoo and lotion Rader prescribed were ineffective in treating his condition. *Id*. at 574.

On June 21, 2021, a waiver of service was returned to the Court executed for Nursing Supervisor Phillips after she had been served with Collymore's initial Complaint in this action. *See* Waiver, ECF No. 18. The waiver was signed by Phillips on June 17, 2021. *Id.*

On June 22, 2021, Phillips responded to Collymore's June 15, 2021 Inmate Request, stating, "I responded to you regarding the same issue on 6-15-2021. You will see dermatology. We will let you know when that appt. is scheduled." Pl.'s Med. Rec., ECF No. 143, at 574. On the same day, a consultation form was generated showing that Collymore had a telemedicine appointment with UConn dermatology, which was scheduled for June 30, 2021. *Id*. at 566. There is no indication on the consultation form as to who created it. *See id.* The consultation form state: "34 year male with recurrent scalp dermatitis consistent [sic] of a bumpy rash with superinfection. Multiple treatments with antibiotics and antifungals have had no lasting effect. Concerned about a connective tissue disorder. Please evaluate and advise and perform biopsy." *Id.*

25

On June 30, 2021, Collymore was seen by the UConn Health Department of Dermatology via a telemedicine visit. *Id*. at 566-68. The dermatologist noted a possible diagnosis of Folliculitis Decalvans and listed three conditions to rule out on the differential diagnosis: early dissecting cellulitis, tinea capitis and discoid lupus. *Id.* According to the Cleveland Clinic: "Staph A bacteria may cause folliculitis decalvans, a condition that causes baldness with scarring (cicatricial alopecia). Inflammation and bacteria in hair follicles cause pustules to form. Hair follicles eventually die, preventing new hair growth and causing circular bald patches. Treatments include antibiotics and photodynamic therapy."[28] The dermatologist's "Assessment/Plan" included prescribing Doxcycline,[29] Clindamycin lotion,[30] and clobex shampoo daily, as well as having Collymore send in a sample of scales and hair to "rule out tinea capitis," and to recheck in two months via telehealth. *Id*. at 567-68.

On July 5, 2021, Collymore submitted an Inmate Request stating that he still had not received the medication prescribed by the dermatologist, and he inquired as to when he would receive the medication because his sores were coming back with blood and puss. *Id*. at 558. He also asked when the culture would be performed. *Id.* Rader saw Collymore on July 8, 2021,

---

[28] Cleveland Clinic, Folliculitis decalvans, https://my.clevelandclinic.org/health/diseases/22784-folliculitis-decalvans. According to the Cleveland Clinic, there is no cure for the condition but it can be treated with various medications.

[29] According to the Mayo Clinic, "Doxcycline is used to treat bacterial infections in many different parts of the body. It is also used to treat pimples and abscesses (usually on the face) that are caused by rosacea, also known as acne rosacea or adult acne. . . . Doxcycline belongs to the class of medicines known as tetracycline antibiotics. It works by killing bacteria or preventing their growth." Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/doxycycline-oral-route/description/drg-20068229.

[30] The Mayo Clinic says: "Clindamycin belongs to the family of medicines called antibiotics." Mayo Clinic, Clindamycin (topical route), https://www.mayoclinic.org/drugs-supplements/clindamycin-topical-route/description/drg-20063064.

and he scraped scales and follicles from Collymore's scalp to send for analysis to UConn dermatology, with the next steps to "await results and re-consult derm." *Id.* at 560. Collymore began receiving the UConn dermatologist's prescription for Doxycycline later that day. Pl.'s Aff., ECF No. 148, at 150 ¶¶ 8-9.

On July 24, 2021, Collymore submitted an Inmate Request, stating that he had run out of the antibiotic Doxycycline medication prescribed by UConn dermatology. Pl.'s Med. Rec., ECF No. 143, at 540. Collymore received approximately one more months' supply of Doxycycline that day. *Id.*; Pl.'s Aff., ECF No. 148, at 151 ¶ 12.

On August 25, 2021, Collymore submitted another Inmate Request stating that he saw black spots on his scalp and he felt his scalp flaring up again, and he also stated that he ran out of his antibiotics but he had only been on the prescription from UConn dermatology for 41 days, not the 60-days prescribed. Pl.'s Med. Rec., ECF No. 143, at 486-87. On August 27, 2021, Rader responded, and he told Collymore he would put him on the medicine again and that Collymore would be seen by UConn dermatology when the medication was finished. *Id.* On the same day, Collymore received a new prescription for Doxycycline, the antibiotic prescribed by the UConn dermatologist. Pl.'s Aff., ECF No. 148, at 151 ¶ 16.

On September 16, 2021, after Collymore had received a full two-month prescription of Doxycycline, he submitted another Inmate Request inquiring about the status of his follow-up appointment with dermatology. *Id.* ¶ 17; Pl.'s Med. Rec., ECF No. 143, at 479. Rader responded that the follow-up appointment had already been scheduled. *Id.*

During the period from July 8, 2021, through September 16, 2021, Collymore's scalp condition drastically improved while taking the Doxycycline, but once the prescription ended, his scalp infection appeared to come back. Pl.'s Aff., ECF No. 148, at 152-53 ¶ 23. On

27

November 5, 2021, Collymore wrote to Rader stating that it had been two months since his initial consultation with UConn dermatology and there were black spots on his scalp with some type of growth. Pl.'s Med. Rec., ECF No. 143, at 460. A registered nurse wrote back to Collymore and advised him that he was on the "MDSC list for follow up." *Id*.

On December 2, 2021, Collymore received notice that he was scheduled for a follow up with dermatology, *id*. at 454, and on December 8, 2021, Collymore had his second visit with dermatology via telemedicine, *id*. at 446-48. The dermatologist noted that Collymore had been diagnosed at the last visit with "Folliculitis Decalvins," and she documented, "Notice significant improvement with resolving drainage. Now only on shampoo and not antibiotics." *Id*. at 446-47. The last entry in Collymore's medical records pertaining to Rader is a May 16, 2022 order for blood work. *Id*. at 369. On May 5, 2022, Collymore was transferred back to MacDougall C.I. Pl.'s Aff., ECF No. 148, at 153 ¶ 25.

## B.    Procedural History

Collymore filed his initial complaint on March 8, 2021, against Warden Chapdelain, Commissioner Cook, Warden Martin, HSA Lightner, HSRC Brennan, and three "John Doe" defendants for deliberate indifference to his scalp condition in violation of the Eighth Amendment. *See* Compl., ECF No. 1, at 3-4. In its initial review on April 2, 2021, the Court[31] dismissed Collymore's complaint. *See* IRO, ECF No. 7. On May 20, 2021, Collymore then filed an amended complaint naming the three "John Doe" Defendants as APRN McPherson, Nurse Myers, and Nurse Supervisor Phillips, *see* ECF No. 13, and the Court entered a service

---

[31] The Honorable Alfred V. Covello.

order for Collymore's amended complaint to proceed against APRN McPherson, Nurse Myers, and Nurse Supervisor Phillips in their individual and official capacities, ECF No. 14 at 1-2.

On August 9, 2021, Nurse Myers and Nurse Supervisor Phillips moved to dismiss Collymore's claims against them on the basis that they were entitled to qualified immunity. *See* ECF Nos. 23, 23-1. On September 10, 2021, the Court granted Nurse Myers' and Nurse Supervisor Phillips' motion on the grounds that there was no controlling authority that a scalp condition causing painful open sores constituted a serious medical need, and thus, they were entitled to qualified immunity. Ruling, ECF No. 30, at 10-11. The Court also *sua sponte* found that APRN McPherson was entitled to qualified immunity, *id*. at 11, and judgment was entered dismissing the case. *See* ECF No. 31.

On September 17, 2021, Collymore appealed the Court's ruling and final judgment to the U.S. Court of Appeals for the Second Circuit. *See* ECF No. 32. On July 14, 2023, the Second Circuit vacated the judgment of the District Court and remanded the case with respect to Collymore's Eighth Amendment claims concerning his scalp condition, *Collymore v. Myers*, 74 F.4th 22, 31 (2d Cir. 2023). The Second Circuit ordered that Collymore "be allowed to further amend his complaint to restate his claims against the defendants named in his initial complaint." *Id*.

The Second Circuit observed that "[b]oth the parties and the district court focused that case review on the first element of the qualified immunity analysis: whether existing caselaw put the Nurse Defendants 'on notice that Collymore's scalp condition was a serious medical need.'" *Id.* at 30. The district court had found an absence of Supreme Court or Second Circuit cases holding that "a scalp condition causing painful open sores is a serious medical need" under the Eighth Amendment. *Id.* The Second Circuit rejected that holding, stated that Eighth

29

Amendment claims for the deprivation of medical care should not be "analyzed body-part by body-part," and instead should be determined by "whether a plaintiff plausibly alleges a condition that produces severe and unmanaged pain." *Id*. at 30; *see also id.* ("So while sufficiently serious medical conditions 'should not be defined 'at a high level of generality, it is error to demand specificity as to the site and cause of pain if it is intense and inflicted in an unnecessary and wanton manner.") (internal quotation marks and citations omitted). The Court observed:

> In sum, it is alleged that Collymore's scalp condition causes him "intolerable" pain that felt like his "scalp was on fire"; has repeatedly become infected and required antibiotics; has produced scabs that ooze pus; has interfered with Collymore's daily life, including his ability to sleep; has resulted in the formation of painful keloid scars; and has proven to be both degenerative and resistant to treatment for years. The right to be free from such a condition is clearly established.

*Id.* (citations omitted). Accordingly, the Second Circuit held it "was therefore error to dismiss Collymore's Amended Complaint for failure to satisfy the objective component of the Eighth Amendment deliberate indifference standard." *Id*.

Subsequently, on September 11, 2023, Collymore filed his SAC against numerous defendants seeking monetary damages and injunctive relief. *See* SAC, ECF No. 45. Upon initial review of the SAC, the Court[32] allowed Collymore's Eighth Amendment claims for deliberate indifference to his scalp condition to proceed against Defendants Commissioner Cook, Warden Martin, HSA Lightner, HSRC Brennan, APRN McPherson, Nurse Myers, and Nurse Supervisor Phillips in their individual and official capacities based on "allegations taking place after March 9, 2017." *See* SAC IRO, ECF No. 49, at 7. The Court also allowed

---

[32] The Honorable Sarala V. Nagala.

30

Collymore's Eighth Amendment claims to proceed against Defendants Dr. Rader, CO Murphy, and APRN Muzykoski (formerly "John or Jane Doe #6") based on "allegations taking place after October 1, 2019." *Id*. at 9. All other claims were dismissed. *See id*. at 10. The Clerk of Court was then ordered to proceed with service against Defendants in their individual and official capacities. Order, ECF No. 50.

On February 12, 2024, APRN McPherson filed a motion to dismiss Collymore's SAC, *see* ECF No. 64, and the DOC Officials and Medical Defendants answered Collymore's SAC in their individual and official capacities, *see* ECF No. 76. On August 30, 2024, the Court denied APRN McPherson's Motion to Dismiss, *see*, ECF No. 104, and APRN McPherson answered Collymore's SAC on September 13, 2024, *see* ECF No. 108. In the interim, Collymore identified "John or Jane Doe #6" as APRN Muzykoski. *See* Not. & Order, ECF Nos. 67, 71. On June 4, 2024, APRN Muzykoski moved to dismiss Collymore's claim against her in her official capacity only. *See* ECF No. 92. The Court granted the motion to dismiss the official capacity claim, *see* ECF No. 126, and APRN Muzykoski filed an answer to Collymore's SAC in her individual capacity, ECF No. 128. On January 6, 2025, this case was transferred to me. ECF No. 135.

On March 3, 2025, the APRN Defendants filed a motion for summary judgment, ECF No. 140, and on the same day, the DOC Officials and Medical Defendants filed a separate motion for summary judgment, ECF No. 142. On June 18, 2025, in response to the Defendants' summary judgment motions, Collymore filed a 208-page document, which contains Collymore's Local Rule 56(a)(2) Statement in response to the APRN Defendants' Local Rule 56(a)(1) Statement, ECF No. 148 at 49-60, Additional Statement of Facts, *id*. at 61-67, and an Affidavit. *Id*. at 96-104. The 208-page document also included his Local Rule 56(a)(2)

31

Statement in response to the DOC Officials and Medical Defendants' Local Rule 56(a)(1) Statement, *id*. at 6-42, an Additional Statement of Facts, *id*. at 43-48, and an affidavit, *id*. at 68-95. Collymore filed a single set of exhibits and additional affidavits that are responsive to both summary judgment motions. *Id*. at 105-208.

Collymore also filed one document containing two separate briefs in opposition to the Defendants' summary judgment motions. *See* ECF No. 149. Collymore has agreed that summary judgment should be granted in favor of Commissioner Cook, CO Murphy, and HSA Lightner. *Id*. at 5. The DOC Officials and Medical Defendants and the APRN Defendants have replied to Collymore's opposition to their summary judgment motions, *see* ECF Nos. 153, 156, and Collymore has filed a surreply responsive to the APRN Defendants, ECF No. 157.

## II.   **LEGAL STANDARD**

A motion for summary judgment must be granted if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id*. at 247-48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the non-moving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding non-moving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to create genuine issue of material fact.'") (quoting *Soto v. Meachum*, 3:90-cv-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

When deciding a motion for summary judgment, I may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier*, 2007 WL 685181, at *7. In reviewing the record, I must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is

improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

### III.  **DISCUSSION**

#### A.  **Exhaustion of Administrative Remedies**

Only the DOC Officials and Medical Defendants argue that Collymore failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). DOC Mem., ECF No. 142-1, at 20-27. Collymore argues that he was prevented from exhausting his administrative remedies as set forth in DOC Administrative Directive 8.9 ("A.D. 8.9" or "Directive 8.9"), and thus the administrative remedy process was unavailable. Pl.'s Mem., ECF No. 149, at 7.

I conclude that Collymore has exhausted his administrative remedies as required by the PLRA. Moreover, I conclude that even if Collymore has not technically exhausted his remedies, genuine issues of material fact remain about whether Collymore's administrative remedies were functionally unavailable to him. Accordingly, I will not grant the DOC officials' and Medical Defendants' motion for summary judgment on the grounds of exhaustion.

#### 1.  **General Principles of Exhaustion**

The PLRA requires a prisoner pursuing a federal lawsuit with respect to prison conditions to exhaust available administrative remedies before a court may hear his case. *See* 42 U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted"); *see also Ross v. Blake*, 578 U.S. 632, 638 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by . . . making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007). The PLRA requires "proper exhaustion"; the incarcerated individual must use all steps required by the administrative review process applicable to the institution where he is confined, and do so properly. *Jones v. Bock*, 549 U.S. 199, 217-18 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the agency holds out, and doing so properly"). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211.

Exhaustion of administrative remedies is an affirmative defense. *Perttu v. Richards*, 605 U.S. 460, 469 (2025). The defendant bears the burden of proof. *See Jones*, 549 U.S. at 216. Once the defendant provides reliable evidence that administrative remedies were not exhausted before the plaintiff commenced the action, the plaintiff must present evidence showing that he did exhaust his administrative remedies or establish that administrative remedy procedures were not available to him. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013); *Quint v. Warden Martin*, No. 3:21-CV-1695 (KAD), 2025 WL 1616625, at *5 (D. Conn. June 6, 2025).

## 2.    DOC Health Services Review Procedures

The DOC's Administrative Directive 8.9 "governs procedures for responding to a prisoner's request for review of health care services." *Coleman v. Charles*, No. 3:23-CV-1581 (JAM), 2024 WL 1991013, at *3 (D. Conn. May 6, 2024). The exhaustion of Collymore's

claims concerning his scalp condition up until April 29, 2021,[33] are governed by a version of A.D. 8.9 that was in effect from July 24, 2012 through April 29, 2021. *See* ECF No. 142-13. All references to A.D. 8.9 pertain to this version of the directive.

Under A.D. 8.9, there are two types of Health Services Reviews ("HSR"): (A) a "review of diagnosis and treatment, including a decision to provide no treatment, relating to an individual inmate"; or (B) a "review of a practice, procedure, administrative provision or policy, or an allegation of improper conduct by a health services provider." A.D. 8.9 § 9. The Directive instructs that prior to applying for any HSR, the applicant is required to first attempt to resolve the health complaint informally. *See id*. § 10. To do this, the applicant can attempt to verbally resolve the issue with an appropriate staff member or send a written request to a supervisor. *Id*. The supervisor is required to respond to a written attempt at informal resolution within fifteen calendar days of receipt of the request. *Id.*

If the applicant is dissatisfied and informal resolution proved unsuccessful, he can then apply for an HSR. *Id.* §§ 11-12. The applicant is required to use the Administrative Remedy Form, CN 9602, and check off either the "Diagnosis/Treatment" box or the "All Other Health Care Issues" box. *Id.* The procedure then differs somewhat depending on whether the applicant is challenging his diagnosis and treatment or a practice, procedure, policy, or improper conduct by a provider. *See Carter v. Revine*, No. 3:14-CV-01553 (VLB), 2017 WL 2111594, at *8 (D. Conn. May 15, 2017).

---

[33] I note that on April 30, 2021, a revised version of A.D.

8.9 became effective and replaced the prior version of A.D. 8.9 that had been in effect since July 24, 2012. *See* https://portal.ct.gov/doc/ad/ad-chapter-8 (last visited Feb. 22, 2026).

To apply for an HSR of diagnosis or treatment, the applicant is required to "explain concisely the cause of his/her dissatisfaction." A.D. 8.9 § 11. In particular, the applicant should "provide a concise statement of what particular diagnostic or treatment decision he/she believes to be wrong and how he/she has been affected." *Id.*

If the request for review of a medical decision is properly submitted, then the HSR Coordinator is required to "schedule a Health Services Review Appointment (HSRA) with a physician, dentist, or psychologist/psychiatrist, as appropriate, as soon as possible and at no cost to the inmate, to determine what action, if any, should be taken." *Id.* § 11(A). If the "physician decides that the existing diagnosis or treatment is appropriate, the inmate shall have exhausted the health services review" and the "physician shall notify the inmate of the decision, in writing within ten (10) business days by indicating 'No Further Action' in the disposition field of CN 9602, Inmate Administrative Remedy Form." *Id.* If, on the other hand, the physician decided that a different diagnosis or treatment is warranted, the physician can act on that decision or refer the case to the Utilization Review Committee for authorization. *Id.* § 11(B).[34]

To apply for an HSR of an administrative issue, the applicant is required to provide a concise statement of what he believes to be wrong and how he has been affected. *Id*. § 12. If the request for review is properly submitted, the HSR Coordinator is required to respond to the request within thirty days of receipt. *Id.* § (12)(A). If the applicant is dissatisfied with the response from the HSR Coordinator, he can appeal within ten days by completing an Appeal

---

[34] The Directive defines "Utilization Review" as "[a] process by which requests for specialty care, treatment, services, and/or diagnostic testing is reviewed for approval based on standardized guidelines." A.D. 8.9 § 3(K).

of Health Services Review form and depositing it in the Health Services box. *Id.* § (12)(B). This appeal is to be decided by a contracted health services provider within fifteen days of receipt. *Id.* § 12(C). For all issues relating to compliance with existing standards, this level of review is final, and the applicant "shall have exhausted the health services review process." *Id.* If the matter relates to a health services policy of the DOC, the applicant can file another appeal to the DOC Director of Health Services within ten days of receipt of the response from the contracted health services provider. *Id.* § 12(D). The DOC Director of Health Services is required to notify the applicant of a decision within 30 days. *Id.* § 12(E). Upon receipt of this decision, the applicant has exhausted the HSR for administrative issues relating to a health services policy of the DOC. *Id.*

### B.    Collymore's Exhaustion of Administrative Remedies

The DOC Officials and Medical Defendants argue that Collymore did not exhaust his administrative remedies because he: (1) failed to properly file his HSR requests, and thus his HSR requests were returned without disposition; (2) was not actually complaining about his treatment, but instead complaining about the fact that he had not yet seen a dermatologist; and (3) never mentioned the names of the individual Defendants in his HSRs. *See* DOC Mem., ECF No. 142-1, at 26-27.

I conclude that Collymore exhausted his administrative remedies. In his third HSR request, dated September 15, 2020, Collymore complains that medical staff at DOC have failed to properly diagnose and treat his scalp condition, which has caused him suffering and permanent harm. ECF No. 142-8, at 11. He asks that his situation be investigated, treated as urgent, and that he be brought UConn. *Id.* HSRC Brennan marked the HSR request "Rejected" and provided three reasons: (1) "URC is not within the power of HSR"; (2) "This is a wait

38

time issue, not 'diagnosis/treatment'"; and (3) "HSR is not for monetary gain or any 'compensation.'" *Id.* at 12.

HSRC Brennan's response indicated that Collymore made requests that were beyond the scope of the HSR process and/or not issues of diagnosis and treatment. However, A.D. 8.9 states that a "Diagnosis and Treatment" review may be requested for "review of diagnosis or treatment *including a decision to provide no treatment*." A.D. 8.9 § 9(A). Collymore's HSR request complained about the harm caused to him by the lack of treatment DOC was providing and thus falls squarely within the scope of an HSR for "Diagnosis and Treatment" under the Directive. A.D. 8.9 provided Collymore with no further recourse after his HSR for "Diagnosis and Treatment" was rejected on an improper basis. Thus, I conclude he exhausted his claims based on his third HSR.

Moreover, Collymore responded to HSRC Brennan's rejection by submitting his fourth HSR request on October 8, 2020, this time checking off the "All Other Health Care Issues" box. ECF No. 142-8, at 15. Although a full copy of this HSR request has not been provided, Collymore complains on the first page that for five years he had "asked for proper diagnosis [and] treatment, and to no avail." *Id.* at 14. Brennan returned this HSR request "Without Disposition," for two reasons. *Id.* at 16. First, she stated: "HSR cannot make an outside appointment happen any faster. Medical has already referred you to see a dermatologist." *Id.* Second, she stated: "HSR is not for financial gain, so the resolution for 'compensation' is not a seekable resolution.'" *Id.*

Even to the extent Collymore's complaint can be reduced to only a complaint about "wait time" for adequate treatment, it is unclear why Brennan thought that issue could not be pursued through *either* the "Diagnosis and Treatment" or the "All Other Health Care Issues"

route. In her Declaration, Brennan states only: "This time, Mr. Collymore checked the 'all other healthcare issues' which is an administrative HSR. However, the substance of Mr. Collymore's complaint remained the same. He wanted his appointment to be scheduled faster." Brennan Decl., ECF No. 142-7 ¶ 19. Brennan says she returned the HSR without disposition "because as I had explained to him multiple times before, Mr. Collymore had already been referred by DOC medical personnel to UConn for a dermatology appointment and there was no way to make this appointment happen any faster." *Id.* ¶ 20. Notably, when Collymore tried to appeal this decision, Brennan informed him that he could not appeal a "Returned without Disposition" decision. ECF No. 1-1, at 2.

Finally, Collymore submitted a fifth HSR request on December 8, 2020, again complaining about his suffering and the failure to address his complaints. He marked this HSR request as falling under "All Other Health Care Issues." ECF No. 142-8, at 9. He said: "I've been put on notice that 'I'm on the list for Dermatology.' Though being put on a list and prolonging diagnosis [and] treatment while my condition worsens, to me is insufficient. With this grievance I ask that the matter be looked into, that my situation be treated as URGENT, and whatever relief deemed appropriate." *Id.* at 10. Brennan marked this complaint as "Rejected" stating: "As already explained in the previous HSRs, the HSR cannot make an outside appointment happen any faster. It is controlled outside the facility." *Id.* at 8. Brennan also indicated that the HSR was duplicative of his previous four HSRs. *Id.*

It is not clear why Brennan marked Collymore's fourth HSR as "Returned Without Disposition" and his fifth as "Rejected." Moreover, Defendants do not explain how Collymore failed to comply with the language of A.D. 8.9 or why a complaint about a delay in treatment— including a delay in seeing an outside provider—cannot be pursued through the HSR process.

Instead, they simply assert that Collymore "never properly filled any of [his HSR requests] out" and "Plaintiff cannot contest that none of the Defendants have the ability to force UCONN to see him any faster." DOC Mem., ECF No. 142-1, at 26-27. But Brennan's view that "there was no way to make this appointment happen any faster" is not a basis to deny an HSR and prevent Collymore from either meeting with a physician about his concerns under A.D. 8.9 § 11 or having the opportunity to be heard by Brennan's superiors under A.D. 8.9 § 12. Moreover, Collymore's HSRs complained about DOC's failure to treat him adequately, not just a delay in an outside appointment. Notably, Defendants do not appear to take the position that the subject matter of Collymore's complaints was beyond the scope of the HSR process. If the subject matter of his complaints is outside the process, however, then Collymore was required to exhaust his claims. *See Ross v. Blake*, 578 U.S. 632, 642 (2016) ("An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.").

Defendants also argue that Collymore's HSRs did not put DOC "on notice as to what he is claiming" and fault him for not mentioning Defendants Myers or Rader by name—"the only Defendants who actually provided treatment to him." DOC Mem., ECF No. 142-1, at 26. However, Collymore's complaint was about *lack* of treatment for his condition. By the time he submitted his fifth HSR, it had been almost a year since he had seen an APRN or doctor about his scalp condition. Under these circumstances, I conclude that Collymore was not required to specifically name the various people who had the ability to treat him, or assist him in getting treatment more quickly, but failed to do so.

In any event, however, even were I to conclude that Collymore failed to exhaust administrative remedies, I would conclude that there are material issues of act as to whether administrative remedies were actually available to him.

41

### C.        Unavailability of Administrative Remedies

Collymore argues that there is a legal basis to excuse him from the exhaustion requirement. *See* Pl.'s Mem, ECF No. 149, at 6-88. Defendants do not respond to these arguments. DOC Defs.' Reply, ECF No. 156.

Collymore asserts that his administrative remedies were unavailable to him because HSRC Brennan: (1) repeatedly imposed requirements on him which were not authorized by the language of A.D. 8.9; (2) demanded that he identify a provider (MD or APRN) whose treatment decision he disagreed with even though Collymore had not seen a provider since January 2020; (3) rejected his HSR applications, which prevented him from taking additional steps to exhaust his administrative remedies; and (4) rejected his December 8, 2020 HSR while simultaneously advising Lt. Peau that his December 8, 2020 HSR was fine. Pl.'s Mem., ECF No. 149, at 7-9; *see also* Pl.'s Aff., ECF No. 148, at 78 ¶ 40.

An individual's failure to exhaust administrative remedies is excusable only if the remedies are in fact unavailable. *See Ross*, 578 U.S. at 642. The Supreme Court has determined that "availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (internal quotation marks omitted). The *Ross* court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 643-44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. "Next, an administrative remedy might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available"

42

when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. The Second Circuit has noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive." *Williams v. Priatno*, 829 F.3d 118, 123 N.2 (2d Cir. 2016). In considering the issue of availability, however, the court is guided by these illustrations. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Construed liberally, Collymore appears to argue that the administrative remedy procedures operated as a simple dead end—with HSRC Brennan unwilling to provide any relief to Collymore, that the administrative remedy scheme was so opaque that it became, practically speaking, incapable of use, and that Brennan thwarted Collymore from taking advantage of the grievance process through machination or misrepresentation. *See Ross*, 578 U.S. at 643-44.

*Ross* provides further guidance as to what a "dead end" to the grievance process may entail. *Id*. at 643. If the "relevant administrative procedure lacks authority to provide any relief, the inmate has nothing to exhaust." *Id*. (internal quotation marks omitted). The same is true "if administrative officials have apparent authority, but decline ever to exercise it." *Id*. Thus, if no such potential to exhaust exists, then "the inmate has no obligation to exhaust the remedy." *Id*.

Another question to ask to determine whether an administrative grievance process was in fact available is whether the relevant procedures were "knowable by an ordinary prisoner in [the person's] situation, or was the system so confusing that no such inmate could make use of it?" *Wine v. Black*, No. 3:18-CV-704 (VAB), 2024 WL 2113734, *19 (D. Conn. May 11, 2024). Contradictory instructions as to a grievance procedure can make an otherwise clear

43

directive "prohibitively opaque." *Sease v. Frenis*, No. 3:17-CV-770 (SRU), 2021 WL 260398, at *9 (D. Conn. Jan. 25, 2021).

At a minimum, the record evidence shows that Collymore attempted to exhaust his administrative remedies on numerous occasions to obtain proper treatment for his scalp condition. First, Collymore submitted multiple Inmate Requests to comply with the requirement that he attempt informal resolution prior to submitting his HSR requests. *See, e.g.*, Pl.'s Med. Rec., ECF No. 143, at 762, 791-92, 830, 877, 903, 907; *see also* Pl.'s IR, ECF No. 1-1, at 12-13, 15; Pl.'s HSR & IR, ECF No. 142-8, at 7. Next, Collymore submitted five HSR requests to HSRC Brennan between March 1, 2020, and December 8, 2020, in an effort to complete the next step in the administrative remedy process in accordance with A.D. 8.9. *See* Pl.'s HSR & IR, ECF No. 142-8, at 2-4, 8, 12-15. In his HSR requests, Collymore asked for proper treatment and expressed concern regarding his scalp condition continually becoming worse, his scalp burning and oozing with pus and blood, scars developing, and the intense pain he experienced causing an inability to sleep. *Id*.

HSRC Brennan "Returned Without Disposition" Collymore's first HSR request by informing him that the request did not qualify under diagnosis/treatment and that the wait time for outside appointments, such as dermatology, fell outside the purview of the HSR process. *Id*. at 6. Brennan "Returned Without Disposition" Collymore's second HSR request, telling him that he had not stated which provider he saw on which date that he disagreed with, and thus, had not attempted informal resolution. *Id*. at 2-3. Meanwhile, Collymore had previously submitted multiple informal written Inmate Requests to obtain treatment for his scalp condition to no avail. Brennan then rejected Collymore's third HSR request, stating Collymore's request was a wait time issue, and not a diagnosis/treatment issue. *Id*. at 12. Finally, Brennan

44

responded to Collymore's fourth and fifth HSR requests by stating that the HSR process could not make Collymore's appointment with dermatology happen any faster. *Id*. at 15. The fourth request was "Returned Without Disposition" and the fifth request "Rejected." *Id.* at 8, 15.

These responses by HSRC Brennan raise a question of fact as to whether it was impossible for Collymore to exhaust his administrative remedies pertaining to the medical treatment he sought for his scalp condition. Brennan told Collymore on four occasions that the relief he sought could not be addressed by HSR, but then in one of Brennan's responses, she told Collymore that he had not specified the provider he saw, and thus, he had not attempted informal resolution. The evidence shows that these responses are contradictory, and that Collymore seemingly reached a dead end when trying to exhaust his administrative remedies. Indeed, A.D. 8.9 provides no instructions for applicants about what recourse they have if they believe their HSR request was improperly "Returned Without Disposition" or "Rejected." Collymore attempted to appeal Brennan's actions with respect to his fourth HSR but she twice informed him he could not appeal an HSR request that was "Returned Without Disposition." ECF No. 1-1, at 2. He complained about Brennan's actions to the Warden, who told him to write to the Chief Regional Operations Officer, which he did to no avail. SAC ¶ 152.

Accordingly, there are questions of fact as to whether the administrative remedy process operated as a simple dead end or was so opaque that it became, practically speaking, incapable of use. *See Ross*, 578 U.S. at 643 (noting an example of a "dead end" is where "a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions"); *Sease*, 2021 WL 260398, at *9 (stating that contradictory instructions as to a grievance procedure can make a directive "prohibitively opaque").

Moreover, the record raises questions of fact as to whether Brennan thwarted Collymore's ability to avail himself of the administrative remedy process either by returning Collymore's HSR requests without a sufficient cause or by failing to fully explain to Collymore how to correct his HSR requests so that his re-filed HSR requests did not keep getting rejected or returned without disposition. *See Abernathy v. Comm'r of Corr.*, No. 3:20-CV-628 (VAB), 2022 WL 3139527, at *10 (D. Conn. Aug. 5, 2022) (finding the record raised a question of fact about whether prison staff thwarted plaintiff's ability to avail himself of his administrative remedies by returning his grievances without a sufficient cause or by failing to explain fully how plaintiff should correct his grievance).

Finally, Lt. Peau's response to Collymore's December 6, 2020 Inmate Request, in which Lt. Peau stated that he spoke to the medical grievance staff and had been told that Collymore's latest HSR was "good," raises a genuine dispute of material fact as to whether Collymore was impeded from exhausting his administrative remedies because he was informed that he had already properly exhausted. *See* Pl.'s IR, ECF No. 1-1 at 15. "Under *Ross*, a misrepresentation renders an otherwise applicable grievance process unavailable when it misleads 'inmates so as to prevent their use of otherwise proper procedures.'" *Mitchell v. Cooke*, No. 23-CV-04348 (LJL), 2025 WL 2644305, at *6 (S.D.N.Y. Sept. 15, 2025) ("The salutary purposes of the PLRA exhaustion requirement cannot be realized unless the grievance process to be exhausted is actually available to inmates and faithfully followed by prisons, which requires that administrative remedies be reasonably communicated to prisoners. It is therefore imperative that prisons refrain from not only clear misrepresentations, but also misleading statements. A statement is misleading when it is of the sort that a reasonable inmate

46

would be entitled to rely on, even though it is at odds with the wording of the grievance process.") (internal quotation marks and citations omitted).

Construing the relevant evidence in the light most favorable to Collymore, I find that genuine issues of fact exist as to whether Collymore's administrative remedies were functionally unavailable to him. Factual disputes exist as to whether his administrative remedies operated as a simple dead end, were so opaque that they were incapable of use, and whether Brennan thwarted Collymore from taking advantage of the administrative remedy process through misrepresentation. Having found that there is a genuine issue of material fact as to whether Collymore administrative remedies were unavailable to him, I next consider the merits of Collymore's Eighth Amendment deliberate indifference claims.

### D. Eighth Amendment Deliberate Indifference Claim - Damages

The Supreme Court has held that deliberate indifference by prison officials to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). There are subjective and objective components to the deliberate indifference standard. *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).

### 1. Objective Component

To establish the objective component of an Eighth Amendment violation, the alleged deprivation of medical care must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The Second Circuit has identified several non-exhaustive factors relevant to the inquiry into the seriousness of a medical condition: "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial

pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted).

Only Defendants APRN McPherson and APRN Muzykoski argue that Collymore's scalp condition did not constitute a serious medical need. APRN Defs. Reply, ECF No. 153 at 2-5. On appeal, the Second Circuit found that Collymore's allegations that his scalp condition caused him intolerable pain, repeatedly became infected, produced scabs, oozed pus, interfered with his ability to sleep, and resulted in the formation of painful keloid scars, constituted an objectively sufficiently serious medical need. *Collymore v. Krystal Nurse Myers, RN*, 74 F.4th 22, 31 (2d Cir. 2023). It is undisputed that Collymore did in fact suffer from a scalp condition that caused him severe pain, repeatedly became infected, produced scabs, oozed puss, and interfered with his ability to sleep and perform daily functions. I therefore conclude that a reasonable jury could find that Collymore had a sufficiently serious medical need, and so I next address the subjective element of Collymore's Eighth Amendment deliberate indifference claim.

### 2.    Subjective Element

To satisfy the subjective component of the Eighth Amendment's deliberate indifference standard, a defendant must have been aware of a substantial risk that the incarcerated individual would suffer serious harm because of his or her actions or inactions. *See Salahuddin*, 467 F.3d at 280. Deliberate indifference is more than mere negligence—it is equivalent to "criminal recklessness," where an individual "disregards a risk of harm of which he is aware." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In general, medical malpractice does not suffice for deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Medical malpractice, may, however, rise to the level of deliberate indifference

if it "involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

Thus, "at summary judgment, [a plaintiff] need only point to evidence—including circumstantial evidence—from which a jury could infer that 'a substantial risk of serious harm exist[ed]' and that the defendant recklessly disregarded that risk through affirmative acts, inaction, or inadequate action." *Suarez v. Morton*, No. 24-872, 2026 WL 741169, at *13 (2d Cir. Mar. 17, 2026). "The relevant standard for deliberate indifference is recklessness. Officials need only be aware of the risk of harm, not intend harm to be deliberately indifferent under the Eighth Amendment." *Id.* (internal quotation marks omitted); *Salahuddin*, 467 F.3d at 280 ("The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices.").

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Suarez*, 2026 WL 741169, *11 (internal quotation marks omitted); *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) ("Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it."); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) ("The state of the defendant's knowledge is normally a question of fact to be determined after trial."); *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer

the existence of this subjective state of mind from the fact that the risk of harm is obvious."); *Hudak v. Miller*, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) (Sotomayor, J.) ("[I]f the evidence shows that the risk of serious medical problems was so obvious that a reasonable factfinder could infer actual knowledge of them on [defendant's] part, this Court must deny summary judgment."); *see also Bardo v. Wright*, No. 3:17-cv-1430 (JBA), 2019 WL 5864820, at *7 (D. Conn. Nov. 8, 2019) (concluding that "the record, taken in the light most favorable to Plaintiff, permits the inference that the risk of skin cancer was sufficiently obvious that [the defendant doctor] must have had actual awareness of it").

It is well established that "[a] prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (citing *Estelle*, 429 U.S. at 106-07). A medical provider may, however, act with deliberate indifference by consciously providing an individual with "an easier and less efficacious" treatment plan, particularly if the provider does so because of an ulterior motive, such as an improper monetary incentive. *Chance*, 143 F.3d at 703-04; *see also Braham v. Perelmuter*, No. 3:15-cv-1094 (JCH), 2017 WL 3222532, at *16-17 (D. Conn. July 28, 2017) (denying motion for summary judgment because a reasonable juror could infer that the defendant-dentist had chosen an easier but less effective treatment by extracting several of the plaintiff's teeth rather than trying to restore them); *Suarez*, 2026 WL 741169, *12 ("Even where a defendant does not outright refuse to remedy a risk, he may exhibit deliberate indifference to a medical need by consciously choos[ing] an easier and less efficacious treatment plan, or by intentionally denying or delaying access to medical care.") (citations and internal quotation marks omitted).

50

"Deliberate indifference may also be inferred where treatment was cursory or evidenced apathy." *Bardo*, 2019 WL 5864820, at *6 (internal quotation marks omitted); *see also Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("A jury could infer deliberate indifference from the fact that [defendant] knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] situation.").

Finally, "inherent in [the Court's] precedent is the principle that a defendant cannot have disregarded a serious risk to a plaintiff, of which he was aware, if he did not have the ability to take some action to alleviate that risk." *Suarez*, 2026 WL 741169, *12. Thus, "liability for deliberate indifference under the Eighth Amendment requires a showing that the defendant had some ability to mitigate the serious risk to a plaintiff's health or safety." *Id.*

Collymore has conceded that summary judgment should be granted in favor of Defendants HSA Lightner, Commissioner Cook, and CO Murphy, so I will only consider Collymore's claims for damages against Defendants APRN McPherson, APRN Muzykoski, Nurse Myers, HSRC Brennan, Nursing Supervisor Phillips, Warden Martin, and Dr. Rader.

### a. APRN McPherson, Nurse Myers, APRN Muzykoski and Dr. Rader

Defendants APRN McPherson, Nurse Myers, APRN Muzykoski, and Dr. Rader were all medical personnel who saw Collymore for his scalp condition while he was either housed at MacDougall CI or Corrigan CC. I discuss Collymore's Eighth Amendment deliberate indifference claims against each of these Defendants in turn.

51

### i.    APRN McPherson

Defendant McPherson is an advanced registered nurse practitioner who worked at MacDougall CI from January 2019 through April 2020. APRN L.R. 56(a)1 St. ¶ 3. Collymore first saw APRN McPherson for his scalp condition on May 14, 2019, and she prescribed Sebex shampoo and clobetasol ointment. *Id*. ¶¶ 6-7. According to Collymore, when he saw APRN McPherson he had visible bumps, open sores, scabs, pus, and blood on his scalp, and he told her that he had been prescribed Sebex for the past five years to treat his scalp, but the condition had continued unabated. Pl.'s Aff., ECF No. 148, at 97 ¶¶ 8, 11, 14-15; *see also* Pl.'s Med. Rec., ECF No. 143, at 1201.

Collymore next saw APRN McPherson on May 21, 2019, APRN L.R. 56(a)1 St. ¶ 10, and he told her that his scalp had gotten worse and he requested that she look at his scalp and refer him to an outside specialist, but she refused and told him he had to choose between having his hypertension or scalp condition addressed, Pl.'s Aff. ECF No. 148, at 99 ¶ 17. Collymore next saw APRN McPherson on August 14, 2019, and he told her that the clobetasol and Sebex shampoo were not working, so she discontinued those medications and prescribed ketoconazole 2% shampoo and triamcinolone 0.05% cream, antifungal medications. APRN L.R. 56(a)(1) St. ¶¶ 14-16. Collymore did not see APRN McPherson again.

I conclude that no reasonable jury could find that APRN McPherson acted with the requisite culpable state of mind to support an Eighth Amendment deliberate indifference claim. Deliberate indifference cannot "be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired." *Perry v. Rupert*, 2016 WL 11478229, at *9 (N.D.N.Y. Apr. 19, 2016) (internal quotation marks omitted). When Collymore first saw APRN McPherson she prescribed him two medications,

clobetasol and Sebex. Although Collymore told APRN McPherson that Sebex had not previously worked, APRN McPherson did not simply prescribe Sebex but also clobetasol (a corticosteroid). Collymore has not pointed to evidence that clobetasol had previously been tried and was ineffective, or that, given his symptoms, it should have been obvious to APRN McPherson that her prescribed course of treatment would be ineffective.

Collymore also asserts that APRN McPherson refused to examine his scalp five days after she had first seen him, but this does not amount to failure to treat in violation of the Eighth Amendment. *See Wright v. Warden Martin*, No. 23-7762-PR, 2025 WL 1091221, at \*3 (2d Cir. Apr. 8, 2025) (finding that, although plaintiff experienced pain intermittently since 2014, defendants' medical judgment to continue with medication for several months in 2020 to treat plaintiff's abdominal pain, rather than order an MRI, did not support an inference of deliberate indifference because neither defendant had reason to believe that the pain posed an excessive risk to health or safety). There is no evidence that APRN McPherson believed that five days after she initially examined Collymore and prescribed medication his scalp condition required a different form of treatment. At most, APRN McPherson's refusal to examine Collymore's scalp five days after she had already prescribed him medication may constitute negligence, but negligence does not rise to the level of a constitutional violation.

Finally, although there is no evidence that APRN McPherson referred Collymore to a dermatologist as he requested at his last visit, there is also no evidence that APRN McPherson was aware that the treatment was not working and nonetheless refused to refer him to a dermatologist. A clinician's failure to refer a patient to a specialist for examination or testing can constitute deliberate indifference where the patient can demonstrate that the need for the referral was obvious. *See, e.g.*, *Bardo v. Wright*, No. 3:17-CV-1430 (JBA), 2019 WL 5864820,

at *8 (D. Conn. Nov. 8, 2019) ("Mr. Bardo has presented expert testimony that Dr. Wright made an 'obvious' misdiagnosis and that Mr. Bardo should have received a prompt referral to a dermatologist for a biopsy. . . . Mr. Bardo has presented evidence that Dr. Wright knew the facial lesion had existed for two years, knew it was not resolving with [his] prescribed treatment, refused to order a biopsy to rule out skin cancer because of the effort involved, and failed to conduct a patient follow-up visit in the necessary timeframe or anytime thereafter."); *Brock*, 315 F.3d at 164 ("Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it.").

The record evidence shows that APRN McPherson treated Collymore over a period of approximately four months, and during the last visit with Collymore, she prescribed him different medications after she was told by Collymore that the medication she had first prescribed had proven ineffective. Under these circumstances, I find that no reasonable jury could conclude that APRN McPherson acted with the requisite culpable state of mind to support an Eighth Amendment deliberate indifference even if the various treatments she tried were ineffective.

### ii.    Nurse Myers

Nurse Myers is a registered nurse who saw Collymore three times in 2019, while he was housed at MacDougall CI. DOC L.R. 56(a)1 St. ¶ 19. Myers first treated Collymore on October 13, 2019. *Id.* ¶ 27. She says that at this visit Collymore requested a refill of the medications that had been prescribed by APRN McPherson—triamcinolone and the ketoconazole shampoo. *Id.* ¶ 28. Collymore denies he requested a refill of the medication. Pl.'s Aff., ECF No. 148, at 69 ¶ 6. Instead, he asserts that he told Myers about the pain he was

experiencing from his scalp condition, showed her his scalp with open sores, blood, and pus, and asked to see a doctor. Pl.'s Aff., ECF No. 148, at 69 ¶ 7. Collymore next saw Myers on November 20, 2019. DOC L.R. 56(a)1 St. ¶ 32. He says he told her he was in pain, showed her his scalp (which visibly presented with bumps, open sores, scabs, blood, and pus), and requested to see a doctor. Pl.'s Aff., ECF No. 148, at 70 ¶ 9. Myers told Collymore he was on a list to see a doctor, and she recommended that he try dandruff shampoo from the commissary. DOC L.R. 56(a)1 St. ¶ 33.

Collymore saw Myers for the last time on December 8, 2019. *Id.* ¶ 36. According to Collymore, after Myers declined his request to see him in the housing unit, he was sent up to medical by a correctional officer. Pl.'s Aff., ECF No. 148, at 138-39 ¶¶ 9-10, 12-13. There, he told Myers that his scalp itched and burned, he would wake up with blood on his pillow, and he had a difficult time sleeping. Pl.'s Med. Rec., ECF No. 143, at 911. He said: "My head is burning and on fire." *Id.* The parties dispute how Myers responded. According to Collymore, Myers told him he "could not see the doctor, but that she would make sure [he saw] the doctor soon." Pl.'s Aff., ECF No. 148, at 139 ¶ 14. Collymore says that after he refused to leave the unit, other nurses came and saw his scalp. *Id.* ¶¶ 15-17. One nurse stepped out and returned with APRN Stork, who immediately saw Collymore's scalp was infected and prescribed an antibiotic, Bactrim. *Id.* ¶¶ 19-20. According to Myers, she was the one who got Collymore seen by APRN Stork, who was the medical provider on duty that day (the so-called "star of the day"). Myers Aff., ECF No. 142-10 ¶ 10. Myers gave Collymore approximately forty tablets of antibiotics that day, *see* Pl.'s Dep., ECF No. 142-5, at 243:4-244:14, but not the full prescription, *id*. at 63:21-64:3.

Defendants argue that Myers contact was "not even negligence, let alone deliberate indifference." DOC Defs.' Mem., ECF No. 142-1, at 35. Defendants observe that as a registered nurse, Myers was able to assess patients and potentially place them on a list to see a medical provider, such as doctor or APRN. DOC L.R. 56(a)1 St. ¶ 25. It was then up to the medical provider to diagnose the patient, prescribe medication, and/or refer that patient to a specialist, such as a dermatologist. *Id.* ¶ 26. Myers did not have the ability to: (i) prescribe medication; (ii) overrule the care decisions of medical providers, such as doctors or APRN's; (iii) refer a patient to specialists or medical providers who worked outside the DOC; (iv) send patients to the emergency room or a hospital without an order from a medical provider such as a doctor or APRN; or (v) make an outside medical provider schedule or speed up a medical appointment with a patient. *Id.* ¶¶ 20, 21, 23-24.

Collymore asserts that Myers, as a registered nurse, had the ability to recognize serious conditions within her experience and knowledge level. Pl.'s Aff., ECF No. 148, at 68-69 ¶ 5. Collymore also asserts Myers had the ability to summon an on-call DOC medical provider, such as a doctor or APRN, immediately, to examine a patient with a serious condition. Pl.'s Additional Material Facts ("AMF"), ECF No. 148, at 44 ¶ 4. It is also apparent from a review of Collymore's medical records that nurses had the ability to send "flag/alerts" to APRNs and doctors to notify them of pressing concerns. *See* Pl.'s Med. Rec., ECF No. 143, at 1186.

Here, drawing all inferences in Collymore's favor, I conclude that there are material issues of fact regarding whether Myers acted with deliberate indifference to Collymore's serious medical needs by failing to take actions within her authority to alleviate his suffering. Although Myers did not have the ability to prescribe medication or deliver Collymore to an outside provider, she could request that an APRN or doctor follow up with Collymore and

could immediately summon the on-duty APRN or doctor—as Collymore says one of Myers' nurse colleagues did on December 8, 2019.

According to Collymore, when he first saw Myers on October 13, 2019, he was in pain with open sores, blood, and pus on his scalp, which Myers observed. By this time, it had been two months since Collymore saw APRN McPherson, who had prescribed antifungal medication addressed at a condition that he did not have. Unsurprisingly, the antifungal medication had not been effective, as Collymore informed Myers. Yet rather than ensuring Collymore promptly saw a doctor, as Collymore requested, Myers arranged for Collymore to receive more of the ineffective medication. When Collymore saw Myers again a month later, on November 20, 2019, he asked again to see a doctor, informing Myers he was still in pain and showing her his open sores. Rather than taking action to expedite Collymore's visit with an APRN or doctor, Myers simply told him he was "on the list" to see one. Finally, on December 8, 2019, even when Collymore reported a pain level of 10 and that his head was "burning and on fire," Myers told him he could not see a doctor though would see one "soon." According to Collymore's account, it was only because he insisted on staying in the medical unit—and risking disciplinary sanctions—that another nurse saw the severity of his condition and summoned the APRN on call, who immediately saw his scalp was infected and required antibiotics.

Given these circumstances, resolving all factual disputes and drawing all inferences in Collymore's favor, I conclude that a reasonable jury could find that Myers knew of the substantial risk of harm to Collymore, as there was an obvious risk that he would continue to suffer from serious pain if his scalp condition was not treated. Moreover, I conclude a reasonable jury could find that Myers had the ability to take action at different points in time

57

to alleviate this risk to Collymore and failed to take action at each juncture. *Suarez*, 2026 WL 741169, \*12. Although Myers has presented a different account of her interactions with Collymore, *see* Myers Aff., ECF No. 142-10, I cannot resolve these factual disputes at this stage of the proceeding.

### iii. APRN Muzykoski

Collymore first saw APRN Muzykoski on December 16, 2019, after he had been transferred to Corrigan CC, APRN L.R. 56(a)1 St. ¶ 24, and at this time, his scalp condition was causing blood and pus to leak from opens sores, Pl.'s Aff., ECF No. 148, at 100 ¶ 23. Collymore told Muzykoski that he had run out of his previously prescribed antibiotic, Bactrim, and she ordered one more week of Bactrim, as well as lotrisone cream. Pl.'s Med. Rec., ECF No. 143, at 908. Collymore testified at his deposition that Muzykoski provided the antibiotics he requested, which provided some relief for his scalp. Pl.'s Dep., ECF No. 142-5, at 212:17-213:21.

Collymore saw Muzykoski for the second and last time on January 13, 2020. According to Collymore, during this visit, his scalp condition was causing blood and pus to leak from open sores, and he had scabs, bumps, and pustules on his head. Pl.'s Aff., ECF No. 148, at 100 ¶ 25. Collymore told Muzykoski that his condition had improved some while he was taking the Bactrim in December 2019, but his condition had deteriorated after the prescription ran out in late December. *Id*. Muzykoski prescribed Bactrim for another fourteen days, APRN L.R. 56(a)1 St. ¶ 31, ordered bloodwork to test Collymore's immune markers, DOC L.R. 56(a)1 St. ¶ 87, and documented in notes of the visit "dermatology referral," Pl.'s Med. Rec., ECF No. 143, at 895.

When viewing the record evidence, I conclude that no reasonable jury could find that Muzykoski was deliberately indifferent to Collymore's serious medical needs in violation of the Eighth Amendment. Muzykoski treated Collymore over a one-month period and both times she saw him she provided him with antibiotics, which Collymore requested—and which he has stated was the only treatment that improved his scalp condition. In addition, Muzykoski referred Collymore to a dermatologist.[35] Muzykoski, like McPherson, did not continue to treat Collymore with an awareness that the treatment was not working. Instead, Muzykoski provided Collymore with antibiotics, which were having some positive effect, and she ordered bloodwork to test his immune markers, a test that came back negative. I conclude that Muzykoski's actions do not amount to deliberate indifference.

### iv.    Dr. Rader

Defendants reference Collymore's deposition testimony for the assertion that Collymore testified that he was likely mistaken about Dr. Rader and was willing to withdraw his claims against Rader. DOC L.R. 56(a)(1) St. ¶ 176 (citing Pl.'s Dep., ECF No. 142-5, at 155:22-157:1). However, Collymore contends that at the time of his deposition, he had not been allowed to review his DOC medical records. Pl.'s Aff., ECF No. 148, at 89 ¶ 81. Thus, Collymore has not agreed to withdraw his claims against Rader. *Id.*[36]

---

[35] Collymore questions whether Muzykoski in fact referred him to the dermatologist. *See* Pl.'s Dep., ECF No. 142-5, at 222:13-24. However, based on the record before me, it is apparent that Muzykoski believes she did submit the referral. Muzykoski Aff. ¶ 6.

[36] Defendants and Collymore never entered into a stipulation of dismissal under Rule 41(1)(ii) Federal Rule Civil Procedure, nor has Collymore requested that I dismiss his claims against Dr. Rader under Rule 41(a)(2). Thus, I will not consider Collymore's claims against Dr. Rader as withdrawn.

While Collymore was housed at Corrigan CC, he saw Rader for the first time on May 12, 2021. Pl.'s Med. Rec., ECF No. 143, at 601. At the time, Rader examined Collymore's scalp and documented that it was possibly infected. *Id.* Rader prescribed Collymore Bactrim antibiotics for ten days and Lubriderm for moisturizing. *Id.* at 1193. Collymore's medical records show that on the same day, Rader inquired as to whether Collymore had a referral for dermatology at UConn. *Id*. Next, on May 20, 2021, Collymore wrote to Rader stating that he had not received the lotion that Rader had prescribed, and Rader responded on June 3, 2021 that Collymore should obtain a conditioner from commissary, and he would obtain a shampoo for the conditioner. *Id*. at 589. Rader then saw Collymore on the same day and Rader noted that the secondary infection had improved, and he would switch Collymore to "medicated shampoo." *Id*. Because Collymore did not want to try Sebex again, Rader prescribed Nizoral. *Id*.

On June 3, 2021, Collymore was informed by Rader that he had found out that he had been taken off the list to see dermatology. *Id.* at 582. On June 15, 2021, Nursing Supervisor Phillips told Collymore that Rader planned to put in another referral to dermatology. *Id*. On June 22, 2021, a consultation form for UConn was created. *Id*. at 565. On June 30, 2021, Collymore was seen by UConn dermatology via a telemedicine visit, and prescribed Doxycycline, Clindamycin lotion, and shampoo. *Id* at 566-68. In addition, the dermatologist requested a skin sample from Collymore's scalp. *Id*.

On July 8, 2021, Rader scraped follicles from Collymore's head to send for analysis to UConn, *id*. at 560, and that same day, Collymore began receiving the Doxycycline prescribed by the UConn dermatologist, Pl.'s Aff., ECF No. 148, at 150 ¶¶ 8-9. On July 24, 2021, Collymore wrote to Rader and advised him that he was not receiving the Doxycycline. *Id.* ¶

12. That same day, Rader told Collymore he would receive the medication from the "med" line, and Collymore received one more month's supply. *Id.* at 150-51 ¶ 12. On August 25, 2021, Collymore wrote to Rader to tell him that he had run out of his Doxycycline prescription. Pl.'s Med. Rec., ECF No. 143, at 486-87. Two days later, Collymore received the remainder of his Doxycycline from Rader. Pl.'s Aff., ECF No. 148, at 151 ¶ 16.

On September 16, 2021, and November 5, 2021, Collymore inquired about the status of his follow-up with UConn dermatology, and Rader advised that Collymore was on the list for a follow-up. *Id.*; *see also* Pl.'s Med. Rec., ECF No. 143, at 460. On December 2, 2021, Collymore received notice that he was scheduled to see the UConn dermatologist, Pl.'s Med. Rec., ECF No. 143 at 454, and on December 8, 2021, Collymore had his second visit with dermatology via telemedicine. *Id.* at 446-48. The dermatologist noted significant improvement and took Collymore off antibiotics but kept him on the shampoo.

Collymore argues that the absence of evidence to support Rader's assertion that he referred Collymore to a UConn dermatologist raises a question about Rader's credibility and suggests that Rader was deliberately indifferent. Pl.'s Mem., ECF No. 149, at 15. Although it is not clear from the consultation form itself who created it, and Rader has not submitted a declaration, the medical records reflect that Collymore first saw Rader on May 12, 2021. Collymore was seen at UConn dermatology less six weeks later, and in the meantime Collymore received antibiotics, which had provided him with some relief in the past.

Even drawing all inferences in Collymore's favor, the evidence does not show that Rader's actions rose to the level of deliberate indifference. None of the documentary evidence demonstrates that Rader was aware that his actions or inactions could have subjected Collymore to a serious risk of harm. Rader made multiple attempts to treat Collymore's scalp

61

condition and responded to Collymore's numerous medical requests either on the same day or relatively soon after. After Collymore was seen at UConn Dermatology, Rader took a skin and hair sample from Collymore's scalp within two weeks. When Collymore also advised Rader he had run out of the Doxycycline, Rader prescribed more, and finally, when Collymore inquired about the status of his follow up with UConn Dermatology, he had his second visit within three months.

The fact that the dermatologist at UConn provided Collymore with different medication than Rader is insufficient standing alone to show that Rader acted with deliberate indifference. *See Benitez v. Palmer*, 654 F. Appx. 502, 505 (2d Cir. 2016) (fact that other doctors subsequently disagreed with prescribed treatment is insufficient to overcome disagreement regarding treatment and create material dispute of fact); *see also Siminausky v. Sean*, No. 3:14-cv-243(VLB), 2017 WL 391425, at *4 (D. Conn. Jan. 25, 2017) ("An exercise of medical judgment that results in a disagreement regarding treatment is not cognizable under the Eighth Amendment"). As such, I find that no reasonable jury could conclude that Rader was deliberately indifferent to Collymore's medical needs in violation of the Eighth Amendment.

### b.    Warden Martin, HSRC Brennan and Nursing Supervisor Phillips

Warden Martin, HSRC Brennan, and Nursing Supervisor Phillips argue that Collymore's deliberate indifference claim is based on allegations that they failed to arrange for Collymore to see a dermatology specialist, but they assert that they did not have the ability to provide Collymore with such a referral and thus cannot be found to be personally involved for any constitutional violation. DOC Mem., ECF No. 142-1, at 29-30. These Defendants also argue that even if Collymore could demonstrate personal involvement, he cannot demonstrate

the subjective prong of his deliberate indifference claims. *Id*. at 30, 33-36. Collymore contends that these Defendants clearly had personal involvement with his scalp condition because each of them had an opportunity and ability to take action to correct his condition or to refer him to someone who possibly could and their failure to act in the face of his serious medical need constituted deliberate indifference. Pl.'s Mem., ECF No. 149, at 14. In essence, Collymore claims that these Defendants were deliberately indifferent because they did not take any action to obtain treatment for him while he continued to experience severe pain. I will address whether the evidence raises disputed issues of fact as to whether each of these Defendants were deliberately indifferent to Collymore's serious medical needs.

### i.   Warden Martin

Warden Martin is not a medical professional, has no specialized medical training, and has never examined or treated prisoner medical conditions. DOC L.R. 56(a)(1) St. ¶ 65. If a prisoner complained to him about a medical condition, he consulted with medical providers at the facility. *Id*. ¶ 66. Martin states that throughout the years, he has relied on and deferred to the medical staff's training, knowledge, and experience when it comes to prisoner medical issues. *Id*. ¶ 69. Martin contends that neither he nor anyone who worked for him had the ability to make a specialist at UConn schedule an appointment with Collymore or any other prisoner, or to make an appointment happen sooner. *Id*. ¶¶ 60-61. Collymore contends that Defendants could have obtained an outside dermatology consult for him at any time in the preceding one and a half years because they were able to obtain a dermatology appointment in June 2021, within weeks of the service of his lawsuit. Pl.'s Aff., ECF No. 148, at 71-72 ¶¶ 15-19.

Martin regularly toured the housing units at Corrigan CC while he was the warden. DOC L.R. 56(a)(1) St. ¶ 63. According to Collymore, he showed Martin his scalp several

times, and Martin had the opportunity to observe Collymore's open sores and scabs on his scalp. Pl.'s Aff., ECF No. 148, at 73 ¶ 22. Martin admits that he saw Collymore during tours of the housing unit and spoke with him, but he says that he never examined Collymore's scalp. DOC L.R. 56(a)(1) St. ¶ 64. Troy Jackson, an individual who was housed in the same block with Collymore for most of 2020 and later became Collymore's cellmate, has attested that he witnessed "Collymore speaking to the Warden, complaining about his scalp, and asking the Warden to do something," as well as requesting to see a doctor. Jackson Decl., ECF No. 148, at 108 ¶ 7.

On March 20, 2020, Collymore wrote to Martin, informing him that his scalp was on fire and itching, he had an ongoing infection on his scalp for quite some time, and had been seen by medical multiple times, but he still had not been properly diagnosed or treated, and he needed to see a doctor. Pl.'s Inmate Request, ECF No. 1-1, at 12-13. Martin checked with Corrigan CC's medical staff, and he was informed that Collymore was being treated with medications, including medicated shampoo. DOC L.R. 56(a)(1) St. ¶ 55-57. Martin says he learned at that time that Collymore had already been referred to UConn dermatology, but UConn was not accepting non-emergency patients because of COVID. *Id.* ¶¶ 57-58.

Here, I conclude that the evidence fails to support Collymore's claim that Martin acted with deliberate indifference. Martin is not a medical professional, and under these circumstances, he was entitled to rely on the medical opinions of his medical staff when he was informed that Collymore was being treated with medications and medicated shampoo for his scalp condition. *See Siminausky*, 2017 WL 391425, at *4 (finding ADA coordinator and warden were entitled to rely on the medical opinion of doctor that climate-controlled facility was medically appropriate); *Shand v. Connecticut Dep't of Corr.*, No. 3:21-CV-523 (SVN),

2022 WL 503952, at *9 (D. Conn. Feb. 18, 2022) (concluding that only the medical staff defendants could be liable for plaintiff's negligence claims because supervisory officials were entitled to rely on the medical care provided by medical staff).

Although Collymore attests, and Jackson corroborates, that Martin spoke with Collymore several times about his scalp condition, these allegations alone are not sufficient for a reasonably jury to find that Martin's actions or inactions rose to the level of a constitutional violation. The evidence presented does not show that Martin ignored Collymore's concerns. Furthermore, although Collymore claims that his June 30, 2021, dermatology appointment is evidence that Martin had the ability to obtain a dermatology appointment for him, there is no evidence that Martin, as a non-medical professional, played a role in coordinating that appointment. In sum, the evidence does not support a finding that Martin's action amounted to recklessness as required to meet the subjective component of a deliberate indifferent claim. Accordingly, based on the record, I find that no jury could reasonably conclude that Martin acted with deliberate indifference towards Collymore.

### ii.     Nursing Supervisor Phillips

During the relevant time period, Nursing Supervisor Phillips was responsible for supervising nursing staff at Corrigan CC. Phillips Decl., ECF No. 142-11 ¶ 6. Her duties also presumably included reviewing and responding to written Inmate Requests to medical, as her responses to Collymore appear in multiple places in his medical records. *See id.* ¶ 12 ("My only interactions with Mr. Collymore related to his claims against me consisted of answering his written inmate requests."). Phillips is trained as a registered nurse and occasionally provided patient care when she covered shifts for nurses. *Id.* ¶ 7.

65

As is set forth above, from January 13, 2020 until May 12, 2021—a 16-month period—Collymore did not see a doctor or APRN regarding his scalp condition. In other words, he did not see a provider who had the ability to diagnose his condition or prescribe medication to alleviate his suffering. During this period of time, Collymore repeatedly notified the medical department at Corrigan CC, through written Inmate Requests and discussions with registered nurses, that his scalp was covered with open sores and puss was painful, itching, and "on fire;" that he was concerned about infection; and that he needed immediate treatment.

Phillips, as the supervisor of the registered nurses who Collymore interacted with, and as the reader of many of his written Inmate Requests, was well positioned to understand what Collymore was going through and respond to it by requesting intervention from an APRN or doctor at the facility. Indeed, she had knowledge of his ongoing complaints because she responded to them on his Inmate Requests. Even a cursory review of his medical records would have revealed how long it had been since Collymore had seen an APRN or doctor.

As is set forth above, starting on February 21, 2020, Phillips began receiving Inmate Requests from Collymore alerting her to the condition of his scalp, the severity of his pain, and his desire for medical treatment. Each time, Phillips responded to Collymore by telling him he was "on the list" to see dermatology. From February 21, 2020, until May 4, 2021, Phillips never took any step to help Collymore see an in-house APRN or doctor, even when it became clear in March 2020 that the COVID pandemic would result in a delay in the dermatology appointment.

Collymore submitted an Inmate Request about the severity of his scalp condition on February 21, 2020, and on February 23, 2020, Phillips wrote to Collymore stating that he "ha[d] a referral to dermatology placed." Pl.' Med. Rec., ECF No. 143, at 879. Collymore

66

wrote an Inmate Request on March 20, 2020, stating that his "scalp [was] constantly on fire, itching, and open soars are spread throughout," and Phillips responded stating, once again, that Collymore was on the list to see dermatology. *Id.* at 877. On September 10, 2020, Collymore wrote an Inmate Request stating that he was continuing to suffer, that his scalp had been infected twice, and requesting "immediate diagnosis and treatment (Hospital)." *Id*. at 791-92. Phillips responded stating that Collymore was on the list to see dermatology. *Id*. at 791.

On December 22, 2020, Collymore submitted another Inmate Request, stating that his scalp was inflamed and hurt, he could not sleep at night, and that he needed to see an "in-house" physician since he had been told he would have to wait to see an outside specialist. *Id*. at 764. Phillips responded that she had placed Collymore "on the list to be seen." *Id.* However, Phillips did not put Collymore on the list to be seen by an APRN or doctor and instead put him on the list to see a registered nurse. *Id.* 765-66. On May 4, 2021, Collymore submitted an Inmate Request, stating that his scalp had been infected twice and asking to be seen by a doctor ASAP. *Id.* at 612. Phillips responded by telling Collymore that he was on the list to see the provider.[37]

On June 9, 2021, Collymore submitted another Inmate Request because Dr. Rader had advised him that he found out that Collymore had been taken off the list to see a dermatologist. *Id*. at 582. On June 15, 2021, Phillips responded and stated that Collymore's initial dermatology consult had been withdrawn because it was over one year old, and Dr. Rader planned to put another consult in the system. *Id*. On June 17, 2021, Phillips signed a waiver of

---

[37] It is not clear if Phillips took any action at this time. Collymore had been "on the list" to see an APRN or doctor since January 2, 2020, when Nurse Fraser put in a request for him to be seen. Med. Rec., ECF No. 143, at 756, 760.

service for Collymore's Complaint in the instant lawsuit. On June 22, 2021, a consultation form was created for UConn showing Collymore had an appointment scheduled with dermatology at UConn on June 30, 2021. *Id*. at 565.

The Inmate Requests that Collymore submitted in which Phillips responded do not encompass the full breadth of Inmate Requests Collymore submitted to medical as, at times, other nurses responded.

Phillips asserts that her role as a nursing supervisor is different from that of a registered nurse because it is administrative in nature, and she does not provide direct patient care, DOC L.R. 56 (a)(1) St. ¶ 71, does not have the ability to prescribe medication to patients or diagnose medical conditions, *id*. ¶ 73, never provided any direct medical care to Collymore, *id*. ¶¶ 81-82, and that she understood that Collymore was being attended to by his normal care providers, *id*. ¶ 112. Phillips also asserts that once a doctor or APRN has referred a patient for an appointment to UConn or an outside medical provider, it is up to UConn or the outside provider to schedule the appointment, and that DOC personnel cannot make UConn or an outside medical provider schedule an appointment with an inmate any faster. *Id.* ¶¶ 76-77. Defendants argue that Phillips cannot be liable for an Eighth Amendment violation because she "merely processed Plaintiff's inmate requests." DOC Defs.' Mem., ECF No. 142-1, at 33.

Collymore states that he observed Phillips engaged in direct personal involvement in patient care on more than once occasion. Pl.'s Aff., ECF No. 148 at 73 ¶ 24. He also states that Phillips, as a registered nurse, has a greater ability to assess medical conditions, and that she had the ability to contact DOC APRNs and doctors to request medication for patients. *Id*. at 73-74 ¶ 25. Collymore also asserts that Phillips had the ability to initiate the process for

emergency transport of a patient by contacting the on-call or in-house doctor or APRN. *Id*. at 74 ¶ 26.

Resolving all factual disputes and drawing all inferences in Collymore's favor, I conclude a reasonable jury could find that Phillips was deliberately indifferent to Collymore's serious medical needs in violation of the Eighth Amendment.

Phillips' job duties involved supervising the registered nurses at the facility. The RNs were responsible for triaging prisoner medical issues and determining when to elevate concerns to the APRNs and doctors at the facility. It is apparent from a review of Collymore's medical records that prisoner complaints about medical issues came to the attention of the medical department through written Inmate Request forms and in-person interactions prisoners had with RNs in the housing units and the medical department. Collymore arrived at Corrigan CC with an active scalp infection that was being treated with antibiotics. In January 2020, APRN Muzykoski renewed Collymore's prescription. Thereafter, Collymore did not see an APRN or doctor until May 2021, sixteen months later. During that sixteen-month period, Phillips was responsible for supervising the nurses who triaged complaints, and she personally reviewed and responded to multiple requests by Collymore for urgent medical attention. It is apparent that Phillips had access to Collymore's medical records during this time, which included documentation of his many complaints about his pain and the condition of his scalp. Despite repeatedly telling Collymore he was "on the list" with dermatology, Phillips was aware that this appointment would be delayed because of the pandemic. Yet despite these circumstances, it appears Phillips took no action to ensure Collymore would be seen by a doctor or APRN at Corrigan CC who could have investigated the cause of Collymore's condition and prescribed him medication. Although an APRN at the facility had determined in

69

January 2020 that a referral to a dermatologist was appropriate, she also addressed Collymore's symptoms through treatment with antibiotics, which had provided him with some relief. Seeing a dermatologist was ideal, but a visit with an APRN or doctor was certainly better than no treatment and could have provided Collymore with some relief—as it had done in the past.

Given all of these circumstances, I conclude that there is sufficient evidence for a jury to conclude that Phillips was aware of Collymore's serious medical condition and acted with deliberate indifference by failing to take action to alleviate the risk of harm to him. The obvious action Phillips could have taken, at any time during the more than a year that she reviewed his complaints, was to ensure Collymore was seen by an APRN or doctor at the facility. As a registered nurse in charge of the nursing department, Phillips had authority and responsibility to elevate prisoner health concerns to the APRN or doctor level at the facility. A reasonable jury could find her failure to do so constituted deliberate indifference. *See Solek v. Wallace*, No. 3:20-CV-01600 (VAB), 2021 WL 2186431, at *9 (D. Conn. May 28, 2021) (allowing Eighth Amendment medical deliberate indifference claims to proceed on initial review against Defendants, including Nursing Supervisor Kara Phillips and RN Janine Brennan, where plaintiff alleged that over a fourteenth-month period he filed multiple inmate requests and medical grievances seeking medication for his hernia condition and a surgical consult, but defendants failed to respond or failed to provide medication and made no effort to facilitate timely scheduling of surgical consultation).

Although not necessary to my conclusion, I note that, given the current factual record, there are substantial questions about when and why Collymore's referral to UConn dermatology was canceled, when Phillips became aware of the cancelation, and what steps she took throughout the months Collymore was waiting to ensure he was, in fact, "on the list" to

70

be seen by dermatology. The only consultation form in the record is the one generated on June 22, 2021. The record contains no correspondence with UConn or anyone in DOC's central office about the referral and no acknowledgement that the steps necessary for a referral were taken. Instead, APRN Muzykoski's notes from Collymore's January 13, 2020 visit simply state "dermatology referral" under "General Note." Although Collymore's medical records contain references by Phillips and others to the dermatology referral, it is not clear where they were looking to confirm the referral was in fact pending—and if they were merely relying on the statements of others that there was a referral. Phillip's explanation on June 15, 2021 that Collymore's "initial dermatology consult was withdrawn because it was over 1 year old" and "Rader plans to put another consult into the system," Pl.'s Med. Rec., ECF No. 143, at 582, leaves it unclear *when* the referral was withdrawn and whether Phillips should have been aware of the withdrawal sooner. If the referral was in fact put in place in mid-January 2020 after Collymore's visit with Muzykoski, then the one-year mark would have passed in mid-January 2021, and Collymore potentially waited for months in 2021 without a referral actually pending.[38]

Finally, although Defendants repeatedly assert that no one at DOC had any power to expedite specialist referrals, the fact that Collymore finally had his telehealth visit with UConn

---

[38] On May 12, 2021, a registered nurse informed Dr. Rader that Collymore's referral to dermatology referral was still active. Pl.'s Med. R., ECF No. 143 at 1193. If Collymore still had a referral in the system on May 12, 2021, and his referral expired after one year, then the referral may not have been initiated until May 2020—which would mean he waited for months in 2020 without a referral actually in place.

dermatology within just a few weeks of DOC receiving notice of this lawsuit—and within just a few weeks of the referral being initiated—casts some doubt on that assertion.[39]

In sum, based on the record evidence, I find that there are genuine disputes of material fact as to whether Phillips consciously disregarded a substantial risk of harm to Collymore. On a motion for summary judgment, "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 2017). Accordingly, I will deny the DOC Officials and Medical Defendants' motion for summary judgment as to Phillips.

### iii.    HSRC Brennan

HSRC Brennan, trained as a registered nurse, worked for the DOC as a Health Services Review Coordinator at Corrigan from April 2015 through December 2023. Brennan Decl., ECF No. 142-7 ¶¶ 2-3. In that position, she was responsible for tracking and responding to Health Services Review requests submitted by prisoners. *Id.* ¶ 4. Brennan says the HSR

---

[39] In other litigation, an individual who arranged specialist appointments for DOC prisoners during this time period stated that she relied on DOC clinical providers to inform her of the urgency of the requests. Although she could not ultimately control when the outside provider saw a patient, she could take steps to try to expedite appointments. *See Torres v. Reis*, No. 22-CV-1008 (SFR), 2025 WL 2374003, at *13 (D. Conn. Aug. 14, 2025) ("Shea acknowledges that she can advocate for a change in the timing of a specialist appointment or procedure but does so only upon request of a DOC clinical provider. Shea relies on the DOC clinical providers to 'advise on the emergent and urgent health care needs of the population.' Shea says that even when she advocates for a change in timing, she has no ability to guarantee that a patient will receive a specialist appointment or procedure on a date certain as DOC contracts with outside providers. Instead, the ultimate decision on any change in the timing of an appointment rests with the outside contracted provider.") (citations omitted).

Coordinator position is solely administrative in nature, that she did not provide direct patient care in that role, and she did not have the authority to overrule or supersede the medical decisions, orders, and determinations of the doctors, APRNs, and medical administrators, nor did she issue orders for patient care. *Id.* ¶¶ 4-6. Brennan also states that she had no interactions with Collymore other than responding to the HSR requests he filed. *Id.* ¶ 9.

Collymore testified at his deposition that Brennan toured the units frequently and he spoke with her regarding his scalp condition for the first time in the beginning of 2020 and several times thereafter. Pl.'s Dep., ECF No. 142-5, at 69:18-71:18; *see also* Pl.'s Aff., ECF No. 148, at 80 ¶ 48. Collymore also asserts that Brennan played a role in denying him medical care by sending every grievance back to him when his grievances "were perfectly fine in accordance with the administrative directives that govern them." Pl.'s Dep., ECF No. 142-5, at 72:2-21.

Collymore relies on Directive 8.9, which describes the duties of the HSR coordinator. *See* Pl.'s Aff., ECF No. 148 at 79-80 ¶¶ 45-47; *see also* A.D. 8.9 §§ (8), (11) & 12. Collymore submits that Brennan, as the HSR coordinator, did have both the authority and obligation to schedule him to see a doctor in response to his medical grievances, and that the HSR Coordinator is obligated to schedule an appointment between an inmate and a physician any time a properly submitted request for review of a medical decision is submitted. *See* Pl.'s Aff., ECF No. 148, at 79-80 ¶¶ 45, 49. Thus, Collymore contends that Brennan's responsibilities as HSR Coordinator included "much more than being a keeper of records" of inmate HSR requests. *Id.* at 80 ¶ 47.

Defendants assert that the failure to comply with an administrative directive does not give rise to its own claim under § 1983. DOC Mem., ECF No. 142-1, at 33-35; *Harris v.*

*Taylor*, 441 F. App'x 774, 775 (2d Cir. 2011). However, Collymore is not attempting to bring a claim against Brennan on the basis that she violated administrative directives. Instead, he asserts that her responses to him constituted deliberate indifference to his serious medical needs.

As set forth above, Brennan responded to five HSRs from Collymore, submitted between March 2020 and December 2020, which complained about his scalp condition. Each time she received an HSR request, Brennan responded by either "rejecting" the HSR request or returning it "Without Disposition." As a result, Collymore never had an opportunity to either meet with a physician or have his concerns addressed by Brennan's superiors—which is the process contemplated by the Administrative Directive governing prisoner complaints relating to medical care.

Brennan, like Phillips, is a registered nurse who was in a position to see Collymore's complaints over a period of many months that his medical needs were not being addressed by a doctor or APRN. In Collymore's first HSR, submitted on March 1, 2020, he told Brennan that his scalp was burning, itching, and there were open sores on his scalp. Pl.'s HSR & Inmate Requests, ECF No. 142-8, at 4-6. In his second HSR request on August 4, 2020, he told Brennan he had consistently been asking for help for his scalp condition and was being denied adequate medical care. *Id*. at 1-3. On September 15, 2020, Collymore submitted a third HSR request, stating that he was continuously suffering, he had asked to see an outside doctor for the past five years, and there was permanent damage to his scalp. *Id*. at 12-13. On October 15, 2020, Collymore submitted his fourth HSR request, stating that he had repeatedly attempted to seek medical help for his scalp, which was "irritable," itchy, burning, and was bleeding with puss and bumps that had spread. *Id*. at 14-15. On December 6, 2020, Collymore submitted his

74

fifth HSR request, stating that for the past five years he had complained to DOC medical about his scalp condition, which itched and burned with blood and pus, and had spread over a large portion of his scalp, leaving scars and causing chronic pain and hair loss. *Id.* at 8.

Like Phillips, Brennan responded to Collymore's requests by telling him that he had a referral pending to see a dermatologist. She stressed to him that she could not make Collymore's appointment with dermatology happen any faster. *Id.* Although Brennan was aware of the delays in seeing specialists caused by the pandemic, she took no action in response to Collymore's complaints to ensure he saw a doctor or APRN. Indeed, to address complaints regarding lack of treatment, the first step under the governing Administrative Directive was for Brennan to schedule an appointment with Collymore and a physician to address his concerns. A.D. 8.9 § (11)(A), ECF No. 142-13, at 3. But instead, Brennan rejected or returned "Without Disposition" all five HSR requests, preventing Collymore from meeting with a physician or appealing her decision. *See* Pl.'s HSR & IR, ECF No. 142-8.

Brennan argues that she lacked the authority to remedy or take action with respect to Collymore's progressively deteriorating scalp condition and that her role as HSR coordinator was solely administrative, Brennan Decl., ECF No. 142-7 ¶¶ 4-8, 24.

I find A.D. 8.9 relevant and instructive as to whether Brennan was able to take action to ensure Collymore was seen by an APRN or physician regarding his scalp condition. *See Harris v. Brennan*, No. 3:21CV906 (MPS), 2021 WL 4593611, at *4 (D. Conn. Oct. 6, 2021) (permitting Eighth Amendment deliberate indifference to medical needs claims to proceed against defendants, including Nursing Supervisor Phillips and HSR Coordinator Brennan, where plaintiff alleged all defendants were "aware of both painful conditions" and "need for testing" to determine cause of abdominal and kidney pain and need for relief from ankle pain

but "the defendants either ignored his requests, delayed the provision of treatment, or failed to facilitate the provision of treatment").

Administrative Directive 8.9, provides, in part, that "[a] properly submitted request for Review of a Medical Decision shall be handled according to the following procedures: . . . [u]pon receipt of CN 9602, Inmate Administrative Remedy Form, the HSR Coordinator shall schedule a Health Services Review Appointment (HSRA) with a physician . . . , as appropriate, as soon as possible . . . to determine what action, if any, should be taken." *See* Pl.'s Aff., ECF No. 148, at 79-80 ¶¶ 45-47; *see also* A.D. 8.9 § (11), (11)(A), ECF No. 142-13, at 3. For "Review of an Administrative Issue," "a properly submitted request for Review of an Administrative Issue shall be handled according to the following procedures: . . . [e]ach review shall be evaluated, investigated, and decided upon by HSR coordinator within thirty (30) days." A.D. 8.9 § (12), (12)(A), ECF No. 142-13, at 4.

As discussed, A.D. 8.9 provides that the HSR Coordinator has the capacity to review an inmate administrative remedy form and schedule a health services review appointment with a physician to determine what action should be taken. A.D. 8.9 § (11)(A). Furthermore, Collymore states that he spoke with Brennan in person on several occasions regarding his scalp condition. Brennan was aware of Collymore's serious medical need because he sent five HSR requests detailing the severe nature of his condition. Because Brennan took no action in response to Collymore's serious medical need, and thwarted Collymore's ability to either have his complaints heard by a physician or pursue an appeal of her decision, I find that there is a genuine issue of material fact as to whether Brennan consciously disregarded the substantial risk of harm Collymore had been and was facing. *See Solek*, 2021 WL 2186431, at *9. The

76

DOC Officials and Medical Defendants summary judgment motion is denied as to Defendant HSRC Brennan.

### E.     Qualified Immunity

Only the DOC Officials and Medical Defendants contend that they are entitled to qualified immunity. *See* DOC Mem., ECF No. 142-1, at 39-40. Because qualified immunity is an affirmative defense, Defendants carry the burden of proving they are entitled to immunity. *Walker v. Bellnier*, No. 21-650, 2025 WL 2088314, at *29 (2d Cir. July 25, 2025) (citing *Palmer v. Richards*, 364 F.3d 60, 67 (2d Cir. 2004)).

Once a court "decide[s] that there is no constitutional violation, there typically is no need to address whether defendants are also protected by qualified immunity." *Duamutef v. Hollins*, 297 F.3d 108, 113 n.1 (2d Cir. 2002). I have already concluded that, viewing the facts in the light most favorable to Collymore, he has failed to demonstrate that Defendants Rader, and Martin violated his constitutional rights under Eighth Amendment.[40] Thus, I need not address whether Defendants Rader and Martin are entitled to qualified immunity. But because I conclude a reasonably jury could find that Defendants Myers, Phillips, and Brennan violated Collymore's Eighth Amendment rights, I procced to assess whether there are disputed issues of fact bearing on whether Defendants Myers, Phillips and Brennan are entitled to qualified immunity.

"Qualified immunity attaches when an official's conduct does not violate clearly

---

[40] Defendants McPherson and Muzykoski do not argue that they are entitled to qualified immunity. Even so, because I have granted their motion for summary judgment on Collymore's claims, I would need not address whether these defendants were entitled to qualified immunity. Because Collymore has conceded that summary judgment should be granted in favor of Defendants Cook, Lightner, and Murphy, I also do not include these defendants in any qualified immunity analysis.

established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (citations omitted). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012). "To determine whether an official is entitled to qualified immunity, we consider (1) 'whether the facts that a plaintiff has shown make out a violation of a constitutional right,' and (2) 'whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct.'" *Matusak v. Daminski*, 165 F.4th 702, 711 (2d Cir. 2026) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)) (alterations adopted).

"A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what [they are] doing violates that right." *Eaton v. Estabrook*, 144 F.4th 80, 93 (2d Cir. 2025) (internal quotation marks omitted). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Id.* (internal quotation marks omitted). "This does not mean that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Bangs v. Smith*, 84 F.4th 87, 96 (2d Cir. 2023) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

In *Eaton*, an excessive force case, the Second Circuit recently held that summary judgment was improper on qualified immunity grounds. The Court explained, "[h]aving concluded that a reasonable jury could find that [the defendant's] force was objectively unreasonable, [the defendant] is entitled to qualified immunity only if, at the time of his conduct, binding case law had not articulated with sufficient specificity that such conduct was

78

unconstitutional, either because of the novelty of the type of force or its application in a novel context." *Eaton*, 144 F.4th at 94. The Court concluded: "We do not think that [the defendant's] conduct—construing all factual disputes in [the plaintiff's] favor—was materially novel in either respect." *Id.*

I have already determined that there is a genuine dispute of material fact as to whether Myers, Phillips, and Brennan were deliberately indifferent to Collymore's serious medical needs in violation of the Eighth Amendment. Thus, these defendants are entitled to qualified immunity only if "binding case law had not articulated with sufficient specificity that such conduct was unconstitutional," either because of "the novelty of the type" of their actions or the ways in which their conduct arose in "a novel context." *Eaton*, 144 F.4th at 94.

It is well established under Supreme Court and Second Circuit case law that medical staff at prisons must not act with deliberate indifference to a prisoner's serious medical needs. The Second Circuit has already held that Collymore's allegations regarding his scalp condition is sufficiently serious to trigger Eighth Amendment protection and that Collymore's right to be free from the "severe and unmanaged pain" that he alleged he experienced for a prolonged period of time "is clearly established." *Collymore v. Myers,* 74 F.4th 22, 31 (2d Cir. 2023). Collymore has now supported his allegations with testimony, affidavits, and medical records.

Moreover, Collymore has presented evidence showing that Myers, Phillips, and Brennan were aware of his condition, and aware that failing to treat it would subject Collymore to further severe and unmanaged pain. Finally, Collymore has presented evidence that all three defendants could have taken steps to ensure Collymore promptly saw a doctor or APRN.

It is clearly established that a defendant may disregard a serious risk to a prisoner's health through either action or inaction. For example, it is clearly established that a plaintiff

79

may establish an Eighth Amendment claim by showing "that the defendants knew of the health dangers and yet refused to remedy the situation, constituting deliberate indifference." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998). Intentionally denying or delaying access to medical care can constitute deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (holding that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment, . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care.") (citations omitted). Prison officials may also "exhibit deliberate indifference to a medical need by 'consciously choos[ing] an easier and less efficacious treatment plan.'" *Suarez*, 2026 WL 741169, at *12 (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)).

A reasonable jury could find that Myers, Phillips, and Brennan knew of the risk that Collymore would continue to suffer from severe pain because of his scalp condition and refused to remedy the situation by arranging for him to see a doctor or APRN who could have treated him. A reasonable jury could find that the actions unnecessarily subjected Collymore to pain. This conduct, if proven, would violate clearly established law. In addition, with respect to Phillips and Brennan, a jury could find that, by choosing to simply wait for Collymore to secure a dermatology appointment even as they were aware of extensive pandemic-era delays, these defendants "consciously cho[se] an easier and less efficacious treatment plan"[41] in violation of clearly established law. *Chance*, 143 F.3d at 703.

---

[41] Indeed, for a period of time, UConn was apparently not even scheduling such appointments. Phillips Decl., ECF No. 142-11 ¶ 21.

These defendants are entitled to qualified immunity only if "binding case law had not articulated with sufficient specificity that such conduct was unconstitutional," either because of "the novelty of the type" of their actions or the ways in which their conduct arose in "a novel context." *Eaton*, 144 F.4th at 94. There is nothing novel about this context or the type of action or inaction at issue here, and numerous disputed factual issues bear on the qualified immunity analysis.

In sum, I conclude there are important disputed factual disputes bearing on whether the actions of Myers, Phillips, and Brennan constituted deliberate indifference in violation of clearly established law that preclude summary judgment on qualified immunity grounds. Therefore, at this stage of the case, Defendants Myers, Phillips, and Brennan are not entitled to qualified immunity.

### F.    Injunctive Relief

As noted, Collymore's claims are also proceeding against Defendants in their official capacities, except for APRN Muzykoski. Prospective injunctive relief against state employees in their official capacities is available under the doctrine of *Ex parte Young*, 209 U.S. 123, 159-160 (1908). I construe Collymore's request for injunctive relief as a request for a permanent rather than a preliminary injunction. As with a preliminary injunction, a plaintiff is entitled to a permanent injunction only where he can show he will be irreparably harmed in the absence of an injunction. *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012). Furthermore, a plaintiff is eligible for a permanent injunction if he actually succeeds on the merits of his claim. *Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 546 n.12 (1987). To demonstrate irreparable harm, a plaintiff must show an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Forest City Daly Housing,*

*Inc. v. Town of North Hempstead,* 175 F.3d 144, 153 (2d Cir. 1999) (citation and internal quotation marks omitted). Injunctive relief is further constrained by the Prison Litigation Reform Act, which provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a).

The Second Circuit has recognized that a plaintiff seeking injunctive relief satisfies the burden of demonstrating irreparable harm by establishing an actual and imminent violation of a constitutional right. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (stating that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm").

In the SAC, Collymore seeks an injunction prohibiting Defendants from retaliating against him and requiring them to provide "meaningful, timely, effective and continuous treatment for his scalp and keiloids." SAC ¶ 206. Defendants contend that Collymore's claim for injunctive relief fails because he acknowledges the variety of medical specialists that he has seen since filing his SAC, and that he is no longer suffering. DOC Off. & Med. Defs.' Mem, ECF No. 142-1, at 36.

Collymore is now housed at MacDougall CI. To the extent he continues to assert ongoing harm, he does not explain how any of the Defendants could address his ongoing concerns. The two defendants who previously worked at MacDougall CI, APRN McPherson and Nurse Myers, are no longer employed by DOC. McPherson Aff., ECF No. 141 ¶ 2; Myers Aff., ECF No. 142-10, ¶ 3. Thus, the evidence demonstrates that these Defendants, at this juncture in the litigation, would not have the ability to grant the injunctive relief Collymore seeks. Thus, I deny Collymore's request for injunctive relief.

IV.    **CONCLUSION**

For the foregoing reasons, Defendants McPherson and Muzykoski's motion for summary judgment, ECF No. 140, is GRANTED. The DOC Officials' and Medical Defendants' motion for summary judgment, ECF No. 142, is DENIED in part and GRANTED in part. I GRANT the motion for summary judgment as to Collymore's Eighth Amendment deliberate indifference claims against Defendants Rader, Martin, Lightner, Cook, and Murphy in their individual and official capacities. The motion for summary judgment is otherwise DENIED as to Collymore's Eighth Amendment deliberate indifference claims against Defendants Myers, Phillips and Brennan in their individual capacities and GRANTED against these Defendants in their official capacities.

The Clerk of Court is directed to terminate Defendants McPherson, Muzykoski, Rader, Martin, Lightner, Cook, and Murphy from this case.

**SO ORDERED.**

New Haven, Connecticut
March 31, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge

83